**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| NETCHOICE, LLC, | |
| *Plaintiff*, | |
| v. | Case No. _____ |
| CHRISTOPHER M. CARR, in his official capacity as Attorney General of the State of Georgia, | |
| *Defendant*. | |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## INTRODUCTION

1.     NetChoice, LLC brings this lawsuit on behalf of its members to challenge Georgia Act 564 (formerly known as S.B. 472), which was signed into law on May 6, 2024, and has an effective date of July 1, 2024.  If allowed to take effect, Act 564 will impose unprecedented and unconstitutional burdens on widely used online services that enable millions of prospective buyers and sellers in Georgia and throughout the country to communicate about potential in-person, offline sales.

2.     At present, Georgia's Inform Consumers Act requires "online marketplaces" to (1) retain information about third-party sales *for which payment was processed by the marketplace*; (2) use that information to identify "high-volume" sellers; and (3) require those sellers to make various disclosures.  *See* O.C.G.A. §§10-1-940 through -942.  These requirements mirror those of the federal INFORM Act, 15 U.S.C. §45f, and they sensibly apply only when an online marketplace processes payment for an on-platform sale (which generates the information necessary to comply).

3.     To illustrate, existing federal and state laws governing "online marketplaces" currently apply to e-commerce marketplaces like Amazon.com, eBay, and Etsy, which are well-positioned to keep track of third-party sellers' total sales and revenues because they not only disseminate third-party product listings but also process the electronic payment when a product is sold.  But these existing laws do

not apply to online services like Craigslist, Facebook Marketplace, Nextdoor, and OfferUp, insofar as they merely serve as forums for classified advertisements. This makes sense. Whether it is a website or a print newspaper, a platform for classified ads has no realistic way to track which items end up being sold—much less where they are sold, to whom, or for how much; such forums merely connect prospective buyers and sellers, who are free to meet and exchange cash on their own terms.

4.     Effective July 1, under the guise of making minor definitional changes, Act 564 will radically expand online marketplaces' obligations under the Georgia Inform Consumers Act by requiring them to keep track of all third-party sales of consumer products "in this state *made by utilizing* [an] online marketplace." Act 564 §2(2) (emphasis added). Absent judicial intervention, that change will transform the Inform Consumers Act from a workable burden applicable to a limited set of e-commerce marketplaces into a nearly impossible requirement that all manner of online services—including those that merely facilitate third-party speech—investigate and retain information about sales occurring entirely off-platform.

5.     Act 564 is invalid for multiple reasons. First, it is preempted by the federal INFORM Act, which forbids any "State" from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements." 15 U.S.C. §45f(g). Act 564 plainly "conflicts with" the INFORM Act, as it adopts a contradictory definition of the key statutory term—"high-volume

third-party seller"—and thus dramatically expands the obligations of online marketplaces well beyond what Congress permitted. Those radically expanded obligations vitiate Congress' express intent to create a single, nationwide rule for online marketplaces, which invariably operate across state borders.

6.     Second, Act 564 violates the First Amendment. Its onerous regulations significantly burden both non-commercial and commercial speech, triggering at least intermediate scrutiny, which Act 564 plainly flunks. Forcing online marketplaces to investigate off-platform activity, obtain and maintain sensitive information that they would not ordinarily collect, and ensure that third-party sellers comply with disclosure obligations that the state does not directly impose or enforce on the sellers (who actually have the requisite data), is not remotely tailored to further the state's asserted interest in "combating organized retail crime," Act 564 §1 (capitalization altered). Indeed, Act 564 is so impossibly burdensome that it could not survive even if it were analyzed as an ordinary disclosure requirement (which it is not).

7.     Third, Act 564 is unconstitutionally vague, as it provides no guidance about what it means to make a sale "by utilizing" an online marketplace "in this state," leaving marketplaces to guess at which types of off-platform transactions they must now attempt to monitor. That vagueness is particularly problematic given that the law imposes investigatory responsibilities on companies to gather information that is not generated in the ordinary course of business and implicates the privacy

interests of third parties.  And vagueness in this context inevitably chills the speech of online marketplaces and sellers alike.

8.     Finally, Act 564 runs afoul of §230 of the Communications Decency Act, which preempts state laws that impose impossible burdens and substantial liability on online services for publishing content provided by third parties.

## THE PARTIES

9.     Plaintiff NetChoice, LLC is a nonprofit based in the District of Columbia.  It is a trade association for Internet companies.  NetChoice's members include (among others) Amazon.com, eBay, Etsy, Meta Platforms, Nextdoor, and OfferUp.[1]  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the free speech and free enterprise that Act 564 undermines.   NetChoice brings this action on its members' behalf to vindicate their constitutional rights and to prevent the economic and other injuries that Act 564 will cause them absent judicial relief.

10.    Defendant Christopher M. Carr is the Attorney General of Georgia. Attorney General Carr is responsible for enforcing the Inform Consumers Act, the

---

[1] Meta Platforms owns and operates Facebook and Facebook Marketplace.  A full list of NetChoice's members is available here: https://archive.ph/30YIb.

scope of which Act 564 dramatically expands.  *See* O.C.G.A. §10-1-945.  Attorney

General Carr is a resident of Georgia.  NetChoice sues Attorney General Carr, in his

official capacity, for declaratory and injunctive relief.

## JURISDICTION AND VENUE

11.    NetChoice's causes of action arise under 42 U.S.C. §§1983 and 1988

and the United States Constitution.  The Court therefore has jurisdiction under 28

U.S.C. §1331.

12.    Venue is proper in the Northern District of Georgia under 28 U.S.C.

§1391 and in the Atlanta Division under LR 3.1, NDGa, because the defendant

performs his official duties in this District and Division and is therefore considered

to reside in this District and Division as a matter of law.

## BACKGROUND

### A.    The Rise of E-Commerce and Online Marketplaces.

13.    Over the past quarter century, the United States has seen exponential

growth in online shopping.  In 2000, the first full year for which the U.S. Census

Bureau collected data, U.S. companies brought in about $25.8 billion in total retail

e-commerce sales—reflecting less than 1% of the country's total retail sales for the

year.[2]  By 2019, the United States' annual retail e-commerce sales had increased

---

[2] U.S. Dep't of Commerce News, *Retail E-Commerce Sales for the Fourth Quarter 2000 Were $8.7 Billion, Up 67.1 Percent From Fourth Quarter 1999, Census Bureau Reports* (Feb. 16, 2001), https://archive.ph/wip/dza49.

more than twenty-three-fold, reaching an estimated $601.7 billion—approximately 11% of total retail sales for the year.[3]

14.    E-commerce takes a variety of forms.  Some retailers that sell their own products at brick-and-mortar stores also sell those same products through a company website.  Some large e-commerce marketplaces such as eBay and Etsy sell little, if any, of their own merchandise and instead serve as a forum for third-party sellers to reach a vast audience of potential consumers.  On other e-commerce marketplaces, such as Amazon.com and Wal-Mart Marketplace, the company that operates the marketplace sells its own products alongside those of third-party sellers.  And e-commerce is not limited to sites specifically designated as "marketplaces"; it also occurs through a host of "social media" services—e.g., Facebook, LinkedIn, and X (formerly known as Twitter)—that "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

15.    Some e-commerce marketplaces, including Amazon.com, eBay, Etsy, and Wal-Mart Marketplace, allow consumers to purchase items from third-party sellers practically anywhere in the United States.  These websites typically require the buyer to provide a shipping address and complete the sale online; the platform

---

[3] U.S. Census Bureau News, *Quarterly Retail E-Commerce Sales, 4th Quarter 2019* (Feb. 19, 2020), https://archive.ph/wip/60tWD.

processes the payment and charges the seller a fee, which is often calculated as a percentage of the total sales price.[4]  Indeed, some such platforms expressly prohibit third-party sellers from encouraging prospective buyers to purchase items they see on the platform through a different venue, or connecting with a prospective buyer on the platform but then completing the transaction offline.[5]

16.    Other online services operate in the space that was once dominated by classified advertisements in print newspapers;  they connect individuals who are looking to exchange goods or services in person.  One example is the website Craigslist, which disseminates tens of millions of classified advertisements (organized by category and location) each month from users around the world. Craigslist charges its users a small fee for listing jobs, property rentals, and some kinds of items, but it does not collect any other fees from buyers or sellers if and

---

[4] *See* Amazon, *Standard Selling Fees*, https://archive.ph/NC7Br (last visited June 4, 2024) ("Referral fees vary by product category.  For every item sold, you'll pay a percentage of the total price or a minimum amount, whichever is greater."); eBay, *Selling Fees*, https://www.ebay.com/help/selling/fees-credits-invoices/selling-fees?id=4822 (last visited June 4, 2024) ("We charge two main types of selling fees: an insertion fee when you create a listing, and a final value fee when your item sells."); Etsy Help Center, *Etsy Fee Basics*, https://archive.ph/wip/T1zte (last visited June 4, 2024) ("Etsy charges 6.5% of the total order amount in your designated listing currency."); Walmart Marketplace, *The Beginner's Guide to Selling on Walmart Marketplace* (Dec. 13, 2022), https://archive.ph/HWQcT ("We deduct a reasonable referral fee from each completed purchase.  Our commission rates vary by category and total sales price but range from 6% to 15%.").

[5] *See, e.g.*, Etsy, *Fees & Payments Policy* §2 (last visited June 4, 2024), https://archive.ph/wip/Hln4b ("[A]ny action to move a transaction off the Etsy platform is strictly prohibited by Etsy.").

when a sale is consummated.[6]  Craigslist does not process payments between consumers and third-party sellers, either.  Instead, the buyer and seller typically meet in person and exchange cash or some other mutually agreeable form of payment.[7]

17.    OfferUp is another classifieds platform; it empowers users to "buy and sell locally," enabling users to market items online and then sell them offline to buyers in their local community.[8]  OfferUp's goal is to be the platform of choice for local commerce by connecting its users through an interface that makes selling an item as easy as snapping a picture from a mobile device.  While OfferUp does give third-party sellers the option of selling certain types of items nationwide—in which case the buyer provides shipping information and OfferUp facilitates an electronic payment through a third-party payment processor called Stripe—it estimates that this option is used for only about 2% of the items sold through its platform.

18.    Facebook Marketplace provides yet another example.  Like OfferUp, Facebook Marketplace gives its U.S. users the option of listing items for sale, arranging in-person meetings with prospective buyers, and completing the sale

---

[6] *See* Craigslist, *Paid Posting Fees*, https://archive.ph/wip/1sGlI (last visited June 4, 2024) ("Publishing your posting is a one time charge. [C]raigslist does not have any subscription fees, or additional charges.").

[7] Craigslist, *Avoiding Scams*, https://archive.ph/wip/fsumI (last visited June 4, 2024).

[8] OfferUp, *How It Works*, https://archive.ph/wip/nFiED (last visited June 4, 2024); *see* OfferUp Help Center, *Getting Paid*, https://archive.ph/wip/cVXtl (last visited June 4, 2024).

offline.[9]  For a small percentage of items, Facebook Marketplace also gives users the option to buy, sell, and ship items using its "checkout" feature, which processes secure payments between a buyer and third-party seller via credit card, debit card, or PayPal.[10]

19.    Individuals may also sell items using Facebook's more general social networking services (as distinguished from Facebook Marketplace).  On Facebook, individuals who sign up for an account can establish mutual connections and share content with family and friends.  Facebook users can post status updates, photos, videos, and links; follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities); join Groups or attend Events that relate to topics of interest; post ads; and privately message one another via Meta's Messenger app.  While these features are not specifically designed for promoting, buying, and selling products, they are often used for such purposes.

20.    Like Facebook, the neighborhood website Nextdoor offers a variety of social networking services, including specific tools for listing classified

---

[9]    *See*   Facebook   Help   Center,   *How   Marketplace   Works*, https://www.facebook.com/help/1889067784738765/?helpref=hc_fnav (last visited June 4, 2024).

[10]    *See* Facebook Help Center, *Sell with Shipping on Marketplace*, https://www.facebook.com/help/773379109714742/?helpref=hc_fnav (last visited June 4, 2024); Facebook Help Center, *Using Checkout on Facebook*, https://www.facebook.com/help/1411280809160810/?helpref=hc_fnav (last visited June 4, 2024).

advertisements.  On Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services.[11]  Among other things, Nextdoor allows a merchant (1) to create a "business page" through which it can market its products to local Nextdoor users; (2) to post content on users' "newsfeed"; and (3) to run paid advertisements. Countless sales are made using these tools.[12]  In addition, Nextdoor allows users to post classified advertisements for personal items and homemade goods through its "For Sale and Free" section.[13]

### B.    Various States Enact Laws Regulating Online Marketplaces.

21.    When the COVID-19 pandemic struck, online shopping became more prevalent than ever.  As Americans' online purchases of consumer goods soared to nearly $800 billion in 2020 and $870 billion in 2021, some elected officials raised concerns about the potential for third-party sellers to misuse online marketplaces.  In March 2021, for example, a group of U.S. Senators voiced concerns about potential "online sale of counterfeit goods by anonymous sellers" and "organized retail crime

---

[11] *See* Nextdoor Help Center, *How to Join Nextdoor*, https://archive.ph/82g1P (last visited June 4, 2024).

[12] *See* Nextdoor for Business, *Nextdoor for Local & Small Businesses*, https://archive.ph/YiVQx (last visited June 4, 2024).

[13] *See* Nextdoor Help Center, *For Sale and Free Guidelines*, https://archive.ph/rObej (last visited June 4, 2024).

rings ... stealing items from stores to resell those items in bulk online."[14]   These Senators proposed federal legislation aimed at ensuring greater transparency among third-party sellers in online marketplaces, but the legislation was not enacted.

22.    In the absence of federal legislation, several States took action—Georgia among them.  On May 4, 2022, Georgia enacted the Inform Consumers Act, which requires online marketplaces (1) to collect contact information, a bank account number, and a tax identification number from any "high-volume third-party seller" and (2) verify that information and periodically prompt the high-volume seller to keep it up to date.  *See* 2022 Ga. Laws Act 820 (S.B. 332) (codified at O.C.G.A. §§10-1-940 through -945).  For most individuals, this tax identification number is their Social Security Number.  In addition, the Inform Consumers Act provides that "an online marketplace shall require any high-volume third-party seller with an aggregate total of $20,000.00 or more in annual gross revenues on its platform to provide to the online marketplace and disclose to consumers in a clear and conspicuous manner" its full name, its physical address, contact information "that will allow for direct, unhindered communication with such seller by consumers," and "[w]hether the high-volume third-party seller used a different seller to supply the product to the consumer upon purchase."  O.C.G.A. §10-1-942.  If a

---

[14] *See, e.g.*, U.S. Senate Comm. on the Judiciary, *Durbin, Cassidy, Grassley, Hirono, Coons, Tillis Introduce Bill to Ensure Greater Transparency for Third-Party Sellers of Consumer Products Online* (March 23, 2021), https://archive.ph/KfATl.

high-volume third-party seller fails to comply with these requirements, the online marketplace must "suspend any future sales activity of such seller until" the seller comes into compliance. *Id.* §§10-1-941(c), -942(c)-(d).

23.    The linchpin of the Inform Consumers Act is its definition of "high-volume third-party seller," which determines the extent of the regulatory burden on online marketplaces and their users.  The statute defines "high-volume third-party seller" as "a person"—other than the owner or operator of the online marketplace—"who sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform," and, "in any continuous 12 month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products of an aggregate total of $5,000.00 or more in gross revenues in this state made through the online marketplace." *Id.* §10-1-940(a)(2), (4), (5).

24.    Importantly, in its original (and, until July 1, present) form, the Inform Consumers Act specifies that, when determining whether a third-party seller has met the "high-volume" thresholds, the online marketplace need only count transactions "for which payment was processed by the online marketplace or through a third party." *Id.* §10-1-940(a)(2).  This limitation is critical to ensuring that the Act's burdens are reasonable and constitutional.  After all, it is relatively easy for a company that handles payment processing (like Amazon or eBay) to identify high-

volume sellers, as the company can readily track each user's total sales and gross revenue based on existing records of *online* transactions.  But it would be extraordinarily burdensome (and likely impossible) for companies like Craigslist, Meta Platforms, Nextdoor, and OfferUp to gather accurate information about which third-party listings lead to *offline* transactions between two private parties, where payment is typically made in cash.  It is one thing to regulate private companies by reference to information they already collect in the ordinary course of processing payment, and quite another to require private companies to discover and maintain information about third parties that the companies would not otherwise possess.

25.    The Georgia Attorney General is tasked with enforcing the Inform Consumers Act.  *See id.* §10-1-945.  The statute authorizes the Attorney General to "bring a civil action" to enforce compliance, enjoin further violations, "[o]btain damages, restitution, or other compensation on behalf of the residents of this state," and "[o]btain other remedies permitted under state law."  *Id.* §10-1-945(a).  "Any violation of [the Inform Consumers Act] shall additionally be a violation of" Georgia's Fair Business Practices Act, which authorizes (among other things) civil penalties of up to $5,000 per violation.  *Id.* §10-1-945(b); *see id.* §§10-1-390, -397(b), -405.

26.    From April 2021 through September 2022, 12 other states enacted similar statutes obligating online marketplaces to collect and verify information from

high-volume third-party sellers, and to require such sellers to disclose certain information to consumers.[15]  Nearly all of them contain the same, sensible limitation on regulatory scope found in the original version of the Georgia law.  That is, in determining which sellers meet the "high volume" thresholds, online marketplaces need only consider sales for which payment was processed by the online marketplace itself, whether directly or through an affiliated payment processor; they need not attempt to investigate off-platform sales.  *See, e.g.*, Ohio Rev. Code §1349.65(B); Cal. Civ. Code §1749.8(b).

27.    While all 13 of the state "Inform Consumers" statutes use the same "high-volume" thresholds—200 discrete sales, totaling $5,000, over 12 consecutive months during the previous 24-month period—there are a host of differences among

---

[15] *See* 2021 Ark. Laws Act 555 (S.B. 470) (Apr. 5, 2021) (codified at Ark. Code §4-119-101 *et seq.*); 2022 Colo. Legis. Serv. Ch. 21 (H.B. 22-1099) (Mar. 17, 2022) (codified at Colo. Rev. Stat. §6-1-1401 *et seq.*); 2022 Ohio Laws 89 (Sub. H.B. 272) (Apr. 6, 2022) (codified at Ohio Rev. Code §1349.65 *et seq.*); 2022 Ala. Laws Act 2022-441 (H.B. 318) (Apr. 14, 2022) (codified at Ala. Code §8-41-1 *et seq.*); 2022 Ill. Legis. Serv. P.A. 102-757 (H.B. 1091) (May 13, 2022) (codified at 815 Ill. Comp. Stat. 356/1-5 *et seq.*); 2022 Okla. Sess. Law Serv. Ch. 378 (S.B. 418) (May 26, 2022) (codified at 15 Okla. Stat. §799A.2 *et seq.*); 2022 La. Sess. Law Serv. Act 316 (S.B. 442) (June 10, 2022) (codified at La. Stat. §51:3261 *et seq.*); 2022 Iowa Legis. Serv. Ch. 1114 (H.F. 2401) (June 13, 2022) (codified at Iowa Code §554F.1); 2022 N.C. Session Law 2022-30 (S.B. 766) (June 30, 2022) (codified at N.C. Gen. Stat. §66-490 *et seq.*); 2022 Pa. Legis. Serv. Act 2022-64 (H.B. 1594) (July 11, 2022) (codified at 73 Pa. Stat. §201-9.4 *et seq.*); 2022 Mich. Legis. Serv. P.A. 153 (H.B. 5487) (July 19, 2022) (codified at Mich. Comp. Laws §445.903n *et seq.*); 2022 Cal. Legis. Serv. Ch. 857 (S.B. 301) (Sept. 30, 2022) (codified as amended at Cal. Civ. Code §1749.8 *et seq.*).

those laws.  For example:

    a.  Arkansas requires every seller that reaches 200 sales and $5,000 in gross revenue to make certain disclosures not only to online marketplaces but also to consumers.  *See* Ark. Code §4-119-103(c).  In contrast, Georgia requires consumer-facing disclosures only for "high-volume third-party seller[s] with an aggregate total of $20,000.00 or more in annual gross revenues" on the relevant marketplace.  O.C.G.A. §10-1-942(a).  California uses yet another standard:  It requires consumer-facing disclosures when the company had at least $20,000 in gross annual revenues "from transactions with buyers in California through the online marketplace in either of the two prior calendar years."  Cal. Civ. Code §1749.8.2(a).

    b.  Arkansas requires a covered third-party seller to disclose to consumers its "full name," "full physical address," whether it "also engages in the manufacturing, importing, or reselling of consumer products," "a working telephone number," a "working email address," and "[a]ny other information determined to be necessary to address circumvention or evasion of the" statute.  Ark. Code §4-119-103(c).  In contrast, several other states (e.g., Georgia, Colorado, and Michigan) require disclosure of just one type of contact information "that will allow for

15

direct, unhindered communication" between consumers and the seller (e.g., phone, email *or* electronic messaging), as well as disclosure of "[w]hether the high-volume third-party seller used a different seller to supply the product to the consumer upon purchase." O.C.G.A. §10-1-942(a); *accord* Colo. Rev. Stat. §6-1-1402(4)(IV); Mich. Comp. Laws §445.903*o*(9)(b).

c. Arkansas, Colorado, and Pennsylvania have adopted "Inform Consumers" laws that purport to regulate "third-party sellers" and "online marketplaces" that operate anywhere in the United States. *See* Ark. Code §4-119-102(3), (5)(A); Colo. Rev. Stat. §6-1-1401(3)(a), (5)(a); 73 Pa. Stat. §201-9.4(q). The other 10 states' "Inform Consumers" laws are limited to in-state activity, though the exact contours of those limitations are far from clear, given the interstate nature of e-commerce. *See, e.g.*, O.C.G.A. §10-1-940(a)(3), (5); *see also infra* ¶¶71-73.

d. The 13 states that have enacted "Inform Consumers" laws also impose a range of different penalties on online marketplaces that fail to comply with them. *Compare, e.g.*, Iowa Code §554F.8 (state attorney general may "[a]ssess civil penalties in an amount not more than one hundred thousand dollars"), *with* Cal. Civ. Code §1749.8.4 (state attorney

general may recover "civil penalty not to exceed ten thousand dollars ... for each violation," plus "[r]easonable attorney's fees and costs"), *and* Ark. Code Ann. §§4-119-104, 4-88-103 (state authorities may prosecute knowing and willful violations as a Class A misdemeanor).

28.     In sum, by October 2022, an uneven patchwork of state-level regulation had emerged, requiring online marketplaces to collect and verify a variety of personal information from their users, securely retain that sensitive information, impose disclosure requirements on certain users, disseminate those mandatory disclosures, and suspend users who failed to comply.

### C.    The Federal Government Enacts the INFORM Act.

29.     In December 2022, Congress stepped in, enacting the Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act—a.k.a., the INFORM Act.  *See* Pub. L. No. 117-328, §301, 136 Stat 4459, 5555-62 (Dec. 29, 2022) (codified at 15 U.S.C. §45f).  The law took effect on June 27, 2023.  *See id.* §301(h), 136 Stat. at 5562.

30.     The federal INFORM Act replaced the emerging patchwork of state-by-state regulation with a single, nationwide framework for regulating online marketplaces that connect prospective buyers and third-party sellers.

31.     The INFORM Act defines "high-volume, third party seller" as a person who "sells, offers to sell, or contracts to sell a consumer product through an online

marketplace's platform" and "in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross revenues." 15 U.S.C. §45f(f)(3)(A), (5).

32.    The Act sensibly limits its scope to transactions processed by the relevant online marketplace, as opposed to off-platform transactions conducted directly by private parties:

> "For purposes of calculating the number of discrete sales or transactions or the aggregate gross revenues ... an online marketplace shall only be required to count sales or transactions *made through the online marketplace* and *for which payment was processed by the online marketplace*, either directly or through its payment processor."

*Id.* §45f(f)(3)(B) (emphasis added).

33.    Online marketplaces must collect and verify the identity, contact information, bank account number, and tax identification number of "high-volume third party seller[s]," *id.* §45f(a).  And online marketplaces must require "any high-volume third party seller with an aggregate total of $20,000 or more in annual gross revenues on [an] online marketplace" to provide additional, consumer-facing disclosures.  *Id.* §45f(b).  If a seller fails to comply with any applicable requirement, the online marketplace must "suspend any future sales activity of such seller until the seller complies."  *Id.* §45f(b)(4); *accord id.* §§45f(a)(1)(C).

34.    Congress underscored its intent for the INFORM Act to replace the

existing state-by-state regulation of online marketplaces by enacting a broad express-preemption clause: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section." *Id.* §45f(g).

35.    Congress' desire to expressly preempt state regulations of online marketplaces makes eminent sense, as such marketplaces invariably operate across state lines.  *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (predicting that "the internet will soon be seen as falling within the class of subjects that are protected from State regulation because they imperatively demand a single uniform rule"); *Am. Civ. Liberties Union v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) (similar).  Indeed, the need for a single, uniform, federal rule was a major motivation for congressional action.

36.    The INFORM Act's express-preemption clause, in particular, played a vital role in marshaling political support for its enactment.  NetChoice initially raised concerns about the law when it was introduced in Congress, but ultimately concluded in light of the express-preemption provision that the legislation reflected a sensible "compromise" that would "avoid a complex patchwork of state laws

related to seller vetting."[16]  Amazon and eBay likewise supported the INFORM Act because they recognized that it would "establish[] a federal standard, preventing an unworkable patchwork of state-level regulations."[17]

37.    Congress' enactment of the federal INFORM Act came as no surprise to the states.   Indeed, the Oklahoma INFORM Act expressly anticipated the possibility that it would be overtaken by federal legislation.  *See* 15 Okla. Stat. §799A.7(C) ("If no federal law that requires online marketplaces to verify and disclose information as described in this act goes into effect prior to January 1, 2023, the Attorney General may promulgate rules necessary to implement and enforce this act.").  To the best of NetChoice's knowledge, no state has enacted a new "Inform Consumers" statute since the federal INFORM Act was signed into law, nor has any state attempted to enforce an existing state-level "Inform Consumers" statute.  Most states thus appear to understand that the federal INFORM Act broadly preempts state-law analogs.

---

[16] Amy Bos, *Georgia Legislature's Move to Redesign INFORM Hurts Small Businesses & Increases Red Tape*, NetChoice (April 3, 2024), https://archive.ph/4mTaS; *cf.* Carl Szabo, *NetChoice Raises Concerns with the Introduction of the INFORM Consumers Act*, NetChoice (March 23, 2021), https://archive.ph/v5xBC.

[17] Brian Huseman, *Amazon supports the U.S. House version of the INFORM Act*, Amazon (Oct. 27, 2021), https://archive.ph/dKQg7; *see* eBay Main Street, *2021 INFORM Act Legislative Recap* (Dec. 16, 2021), https://archive.ph/hVujT (vowing to advocate for the INFORM Act because it would preempt similar state laws and "create a common sense federal framework and avoid a patchwork of state laws").

**D.      Georgia Radically Expands Its Inform Consumers Act.**

38.    Georgia did not get the message.  On May 6, 2024, Governor Kemp signed Act 564, which dramatically expands the scope of—and the regulatory burdens imposed by—the state's Inform Consumers Act and jumps the tracks between permissible recordkeeping and disclosure obligations and impermissible investigation mandates.  Act 564 is scheduled to take effect on July 1, 2024.

39.    As originally enacted, the Inform Consumers Act was, like the federal INFORM Act, limited to transactions "for which payment was processed by the online marketplace"—in other words, information that companies generate in the ordinary course and transactions about which an online marketplace can reasonably be expected to maintain records.  *See supra* ¶24 (citing O.C.G.A. §10-1-940(a)(2)), ¶32 (citing 15 U.S.C. §45f(f)(3)(B)).  Act 564 removes this crucial guardrail, expanding the Georgia statute's coverage to encompass all sales "*made by utilizing* [an] online marketplace."  *See* Act 564 §2(2) (emphasis added) (showing amendments in redline).

40.    Consequently, as of July 1, 2024, Georgia will require that classifieds platforms such as Craigslist, Facebook Marketplace, Nextdoor, and OfferUp investigate, maintain information about, and impose and police disclosure obligations on third-party sellers based on sales that occur entirely offline—in-person, cash transactions that these classifieds platforms have no realistic way to

monitor.  That demand is not just impractical but incredibly burdensome and intrusive.  If Act 564 takes effect, it would require classifieds platforms to begin collecting and retaining sensitive data—including Social Security Numbers—for millions of Georgia users who simply list items for sale, in order to determine which of those users may be approaching the "high-volume" thresholds for sales and total revenue.  To even attempt to comply, a classifieds platform would need to ask every individual who lists an item whether the listing led to a sale, where the sale occurred, and what the buyer paid.  But the platform would have no realistic way of requiring sellers to answer those questions.  Nor would it have any realistic way of knowing whether the seller is telling the truth.

41.     Further complicating matters, online services that primarily connect individuals seeking offline, in-person transactions but also process a small number of sales online (such as Facebook Marketplace and OfferUp, *see supra* ¶¶17-18) will need to create a system that tracks each third-party seller's combination of online and offline sales, as the combined number of sales and the total revenue from all those sales will determine which sellers meet the "high-volume" thresholds, and hence are covered by the Act's recordkeeping, disclosure, and disclosure-policing obligations.

42.     Moreover, Act 564 is so broadly worded that it appears to encompass not only individuals who post a "for sale" listing on Craigslist, Facebook

Marketplace, Nextdoor, or OfferUp, but also companies that run advertisements on those platforms. After all, such advertisers "utiliz[e] an online marketplace" to "sell" or "offer[] to sell... consumer product[s]," and are typically "independent of [the] online marketplace." Act 564 §2(4), (5). Act 564 thus appears to require online services to collect and maintain information about how many "discrete sales or transactions" each advertiser makes "by utilizing the online marketplace"—in other words, how many sales are traceable to their advertisements. But online services typically lack access to that information. In some cases, a seller may collect data about how many sales stem from a buyer "clicking" a particular online ad, but in many cases only the buyer knows whether a given purchase was traceable to a particular advertisement.

43.    Even worse, Act 564 could well be construed not only to dramatically extend the Inform Consumers Act's coverage of Facebook Marketplace, but to extend the law's coverage to Facebook itself and to other social-networking services. Facebook arguably meets the Inform Consumers Act's definition of "online marketplace":  (1) Facebook is arguably a "consumer-directed ... platform," as evidenced by the number of companies that pay to advertise their products on it; (2) Facebook's social networking and messaging features "enable third-party sellers to engage in the sale ... of consumer products within [Georgia]," and are "used by one or more third-party sellers for such purpose"; and (3) Facebook's detailed Terms

of Service appear to create "a contractual or similar relationship with consumers governing their use of the platform to purchase consumer products."[18]  The same goes for Nextdoor.  *See supra* ¶20.

44.    Georgia's broad definition of "online marketplace" was unproblematic, so long as the Inform Consumers Act covered only sales "for which payment was processed by the online marketplace."  O.C.G.A. §10-1-940(a)(2).  Because Act 564 eliminates that limitation, however, Meta Platforms and Nextdoor now face the specter of being forced to track all activity on their sites that might lead to a sale, investigate whether such sales actually occur, and collect enough information about those sales to determine who is a "high-volume seller."  In other words, Act 564 appears to require these online services to collect and maintain sensitive information about any Georgian who "utiliz[es]" their general social networking tools (as distinct from Facebook Marketplace and Nextdoor's "For Sale and Free" feature)—e.g., an artist, carpenter, florist, or other small business that uses these tools to promote its products, or even a mom who uses the platform to notify friends that her daughter is selling Girl Scout Cookies outside the local grocery store.  This would be extraordinarily burdensome, if not impossible.  Worse still, the Act would put

---

[18] *See, e.g.*, Meta, *Commerce Policies Overview*, https://archive.ph/bNZ3m (last visited June 4, 2024) (detailed terms governing what users may buy and sell through Facebook, Instagram, and WhatsApp); Facebook, *Meta Commercial Terms*, https://archive.ph/RnYHt (last visited June 4, 2024) (similar).

Facebook and Nextdoor in the position of policing the off-platform activities of its users, mandating disclosures by those third parties, and then carrying some of those disclosures as part of its own communications with users.

45.     While there is significant uncertainty about the precise scope of the Inform Consumers Act, as amended by Act 564, this much is clear:  Act 564 imposes onerous obligations on NetChoice members involving everything from data collection and retention, policing third-party speech, and carrying mandatory disclosures themselves.    It is also clear that there are harsh penalties for noncompliance.  A company that fails to collect the required information from a "high-volume third-party seller" or mandate and carry the required consumer-facing disclosures commits "an unfair or deceptive act or practice in violation of the Georgia Fair Business Practices Act."  Ga. Attorney Gen.'s Consumer Prot. Div., *Inform Consumers Act*, https://consumer.georgia.gov/inform-consumers-act (last visited June 4, 2024).  As Attorney General Carr has emphasized, this "could result in the imposition of significant civil penalties"—up to $5,000 *per violation*, even if there is no evidence of actual harm to consumers.  *Id.*; *see* O.C.G.A. §§10-1-945(b), -397(b).

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Supremacy Clause – INFORM Act Preemption**
**(42 U.S.C. §1983)**

46.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set forth herein.

47.    Under the Supremacy Clause, "state laws that interfere with, or are contrary to, federal law" are invalid. *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020). When, as here, "Congress has enacted an express-preemption provision," the court must "identify the state law that it preempts according to ordinary principles of statutory interpretation." *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc). Here, text, context, statutory structure, and common sense all point to the same conclusion:  The federal INFORM Act preempts Act 564.

48.    "The starting point in statutory interpretation is the language of the statute itself." *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Ardestani v. INS,* 502 U.S. 129, 135 (1991)); *see also, e.g.*, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011). In determining Congress' intent, the court must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). "All those tools of divining meaning—not to mention common sense ... demonstrate that"

the federal INFORM Act preempts Act 564. *Id.*

### A.    Text

49.    The INFORM Act's express-preemption clause has four components: "[1] No State or political subdivision of a State, or territory of the United States, [2] may establish or continue in effect [3] any law, regulation, rule, requirement, or standard [4] that conflicts with the requirements of this section." 15 U.S.C. §45f(g).

50.    The clause's first three components are indisputably satisfied. Georgia is a "State," and by enacting Act 564 it has "establishe[d]" a new "standard" defining which users of online marketplaces are subject to regulation as high-volume third-party sellers. *Id.*   The fourth component is also satisfied—and Act 564 is therefore invalid—if Georgia's new standard "conflicts with" the federal standard.

51.    In ordinary usage, the verb "conflict" connotes that two things are "different" or "fail to be in agreement or accord." Conflict, *Merriam-Webster Dictionary*, https://archive.ph/xo7Dg (last visited June 4, 2024); *accord* Conflict, *Am. Heritage Dictionary of the Eng. Language*, https://archive.ph/zEk4r (last visited June 4, 2024) (to "differ"); Conflict, *Oxford English Dictionary* ("to clash"; "to be at variance").

52.    There can be no serious dispute that Georgia's new third-party-seller rules are "different" from, and not "in agreement or accord" with, Congress' third-party seller rules.  Act 564 and the INFORM Act adopt strikingly divergent

definitions of the exact same legal term—a term that is critical to defining the scope of the legal obligations the laws impose. Whereas federal law defines "high-volume third-party seller" as one who achieves the requisite volume of sales (1) "made through [an] online marketplace"; and (2) "for which *payment was processed by the online marketplace*, either directly or through its payment processor," 15 U.S.C. §45f(f)(3) (emphasis added), Georgia now defines that term as anyone who achieves the requisite volume of sales "by utilizing [an] online marketplace," Act 564 §2(2).

53.    This is no small difference. Georgia's definition is vastly broader than Congress', as it sweeps in not just transactions "processed by [an] online marketplace," 15 U.S.C. §45f(f)(3), but countless transactions where a classifieds platform or other online service was merely "utilized"—even if sales took place entirely off-platform or entirely in cash. *See supra* ¶¶38-44. That difference is fundamental, as the federal requirement is sensibly limited to information that a regulated entity is likely to possess, or can readily collect, by virtue of the payment-processing role it has chosen to take on. Georgia's requirement, by contrast, extends well beyond transactions in which the regulated entity processes payment, and thus amounts to an onerous obligation to investigate private parties' independent off-platform dealings. There is thus unquestionably a clear "conflict"—that is, a difference or disagreement—between the requirements chosen by Congress and the requirements imposed by Act 564.

### B.    Statutory Context and Structure

54.    The phrases surrounding "conflict" in §45f(g) reinforce Congress' broad preemptive intent. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) ("[A] word is given more precise content by the neighboring words with which it is associated."). The clause defines the political entities to which it applies in the broadest possible terms: Its preemptive effect reaches every "State," "political subdivision of a State," and "territory of the United States." 15 U.S.C. §45f(g). The clause also describes *what* is preempted in the broadest possible terms—"any law, regulation, rule, requirement, or standard." *Id.* The clause's temporal reach is similarly expansive. It forbids states not only from "establish[ing]" new measures but also from "continu[ing]" existing measures "in effect." *Id.* The breadth of these neighboring phrases confirms that the INFORM Act's preemption clause has a wide scope that readily encompasses Act 564.

55.    The INFORM Act's enforcement provisions support reading its preemption clause as displacing any inconsistent state requirement, as they expressly contemplate that the FTC and state attorneys general will work together to enforce a single federal standard. *See* 15 U.S.C. §45f(c)(2)(A), (d)(1). Indeed, the Act takes pains to ensure that federal and state authorities do not initiate duplicative or overlapping actions. When a state attorney general brings a suit to enforce the INFORM Act, he or she must notify the FTC, which is expressly authorized to

29

intervene and "be heard on all matters arising therein." U.S.C. §45f(d)(2), (3). Similarly, once the FTC initiates an enforcement action against a defendant, a state may join that action but may not file a separate action. *Id.* §45f(d)(4)-(5). Those provisions presuppose that states cannot impose burdens on online marketplaces vis-à-vis off-platform transactions that the federal law leaves unregulated.

56.    The historical context confirms that the federal INFORM Act precludes states from adopting their own, divergent standards. As explained, the federal law followed a wave of state laws imposing similar—but not identical—requirements. *See supra* ¶¶21-28. That patchwork of state-level regulation prompted Congress to act. *See supra* ¶¶29-37. That is hardly surprising; as courts have emphasized time and again, when it comes to inherently interstate technology like the Internet, federal rules are generally preferable to state ones. *See, e.g.*, *Am. Booksellers Found.*, 342 F.3d at 104; *Johnson*, 194 F.3d at 1162. Indeed, given the impracticality of complying with 50 state laws and 50 different standards, allowing state-by-state legislation would likely make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Commerce Clause concerns. *Am. Libraries Ass'n v. Pataki*, 969 F.Supp.160, 183 (S.D.N.Y. 1997).

57.    In short, Congress plainly intended to create a single, nationwide standard applicable to nationwide online marketplaces. The federal INFORM Act

thus would preempt Act 564 even if it did not contain an express-preemption clause, because Act 564 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 486 (11th Cir. 2015) (quoting *English v. Gen. Electric Co.*, 496 U.S. 72, 79 (1990)).  But in all events, the express-preemption clause itself makes plain that Georgia may not undermine the federal INFORM Act by enacting a definition of "high-volume third-party seller" that diverges from the federal government's definition of that crucial statutory term.

## COUNT TWO
## First Amendment
## (42 U.S.C. §1983)

58.    NetChoice re-alleges and incorporates by reference the allegations stated in paragraphs 1-45 as though fully set forth herein.

59.    Act 564 violates the First Amendment.  It triggers heightened scrutiny by imposing major burdens on the rights to speak, listen, and associate.  And the exceedingly onerous obligations it imposes on speakers—but not sellers engaged in the potential illegal activity it targets—cannot begin to satisfy that scrutiny.  Indeed, Act 564 is so burdensome that it would violate the First Amendment even if viewed as an ordinary disclosure requirement (and there is nothing ordinary about it).

### A.    Act 564 Triggers Heightened First Amendment Scrutiny.

60.    Act 564 triggers heightened scrutiny in multiple ways.  First, it

impinges on the First Amendment rights of companies that operate online marketplaces, i.e., NetChoice's members.  Just as the First Amendment protects a newspaper's right to disseminate advertisements, it protects NetChoice members' right to disseminate third-party sellers' speech and to exercise editorial discretion regarding the listings, advertisements, and other content they wish to disseminate and display on their own websites.  *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *NetChoice v. Attorney Gen., Fla.*, 34 F.4th 1196, 1213-14, 1216-17 (11th Cir. 2022).  Act 564 severely burdens those expressive activities by forcing those engaged in them (1) to investigate and maintain information about third-party sales that occur entirely off-platform, which they otherwise would have no reason or ability to track; (2) to mandate and carry disclosures by "high-volume third-party sellers"; and (3) to verify the accuracy of such information and disclosures.  By so requiring, Act 564 "exacts a penalty" from those who choose to disseminate third-party speech that entails any kind of offer of an item for sale (which of course is itself protected speech).  *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).  Laws that impose such burdens on constitutionally protected speech are subject to heightened First Amendment scrutiny.  *See Wash. Post v. McManus*, 944 F.3d 506, 515-17 (4th Cir. 2019) (state law requiring "online platforms" to publicly post certain facts about the paid advertisements they carry triggered heightened scrutiny because it "deter[ed]

hosting" such constitutionally protected speech); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

61.     Second, Act 564 compels speech—multiple times over.  For one, it forces online marketplaces to require anyone who could potentially qualify as a high-volume seller based on off-platform activity to turn over information sufficient for the online marketplace to make a judgment about whether further disclosures are mandated.  For another, if the third party qualifies as a high-volume seller, Act 564 mandates disclosure of personal information, including sensitive items such as bank account numbers and Social Security Numbers, to online marketplaces.  O.C.G.A. §10-1-941(a).  Finally, it forces some of those sellers to provide—and online marketplaces to convey—consumer-facing disclosures. *Id.* §10-1-942(a).  Time and again, the Supreme Court has applied heightened scrutiny to laws that compel speech, including "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *see Nat'l Inst. of Fam. Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 773-75 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-801 (1988).

62.     Third, Act 564 will inevitably result in the suppression of significant amounts of constitutionally protected user posts and item listings on the online services it regulates.  Act 564 will prompt some users to refrain from perfectly

legitimate speech to avoid having to hand over their bank information and Social Security Numbers to online marketplaces that are being commandeered to act as the state's enforcement agents. Moreover, given the steep compliance costs and hefty civil sanctions for non-compliance, online services will inevitably conclude that some user content they would otherwise display and disseminate raises too many risks. *See McManus*, 944 F.3d at 516-517. The law thus not only overrides the online marketplaces' editorial discretion and restricts potential high-volume sellers' right to speak, but also burdens the First Amendment rights of users of online marketplaces who would willingly view the suppressed listings and advertisements. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (permitting bookseller to vindicate "the First Amendment rights of bookbuyers").

### B.    Act 564 Cannot Survive First Amendment Scrutiny.

63.    Act 564 burdens both non-commercial and commercial speech, and thus unquestionably triggers at least intermediate scrutiny, which requires the state to show that the law is "narrowly tailored to achieve" a substantial governmental interest.[19] *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *see also*

---

[19] NetChoice reserves the right to argue that strict scrutiny applies because (1) Act 564 burdens more than just commercial speech and (2) its heavy burdens on protected expression should receive strict scrutiny regardless of whether it affects only "commercial speech." *See Lorillard Tobacco*, 533 U.S. at 572 (Thomas, J., concurring in part and concurring in the judgment) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it

*Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017).  The state cannot satisfy that demanding test.

64.    The Georgia Attorney General's official website describes the Inform Consumers Act as an effort "to prevent criminals from selling stolen goods on any online marketplace platform and to protect Georgians who unknowingly purchase these stolen and counterfeit goods."[20]  Act 564 purports to advance these same goals. *See* Act 564 §1 ("This Act shall be known and may be cited as the 'Combating Organized Retail Crime Act.'").[21]  While the state undoubtedly has a legitimate interest in combating organized retail crime and helping consumers avoid stolen or counterfeit goods, Act 564 is not remotely tailored to advance those interests.

65.    To begin, Act 564 is wildly overinclusive; it burdens huge swathes of constitutionally protected expression that have nothing to do with "organized retail crime."  Instead of targeting misleading or unlawful speech (or even consummated sales), the Act imposes onerous obligations on online marketplaces—even classifieds platforms that do not participate in transactions and instead merely

---

conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'").

[20]  Ga. Attorney Gen.'s Consumer Prot. Div., *Inform Consumers Act*, https://consumer.georgia.gov/inform-consumers-act (last visited June 4, 2024).

[21]  *Accord* Press Release, Sen. John Albers, *Sen. John Albers Applauds Signage of Legislation to Support Small Business Success and Public Safety Across Georgia* (May 7, 2024), https://archive.ph/QNibX (asserting that Act 564 "will create protections for businesses to combat organized online retail crimes").

provide a forum for third-party speech that may or may not culminate in an off-platform sale. And because it is practically impossible for classifieds platforms and other online services to monitor the huge volume of *off-platform* transactions that their services in some way facilitate, which is essential to determine who is a "third-party seller" under Act 564, the law will almost certainly force them to suppress the speech of a host of small businesses (and potentially even individuals like Girl Scouts) that they would prefer to carry and that have zero connection to retail theft or other unlawful conduct. *See* Act 564 §§2(2), (4), (5); *McManus*, 944 F.3d at 510 (attempt to combat foreign election interference by forcing "online platforms" to disclose information about third-party political ads was "too circuitous and burdensome" to satisfy heightened scrutiny).

66. On the flipside, Act 564 is "wildly underinclusive when judged against its asserted justification." *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). Notwithstanding its title, the Act does not even prohibit (much less prevent) "organized retail crime" or impose any civil or criminal penalty on individuals who traffic in stolen, counterfeit, or dangerous consumer goods. Indeed, it does not even *directly* regulate third-party sellers at all. Rather than require high-volume sellers, who have ready information about the volume, nature, and location of their own sales, to make certain disclosures whenever and wherever they offer an item for sale, Act 564 instead imposes obligations and potential penalties *solely* on websites

engaged in speech (but not the processing of sales). Regulating speakers rather than those involved in the primary activity the state purports to target is the antithesis of narrow tailoring. This misdirection of the Act's obligations and penalties will render it nearly useless in stopping illegal sales by organized criminals. It will take little effort for those actual criminals to evade the law. At most, Act 564 might inconvenience them by impelling them to conduct more of their illegal activities entirely offline, to spread their online transactions among several different websites, or to create multiple "seller" accounts. "That is not how one addresses a serious social problem." *Id.* at 802.

67.    Indeed, Act 564 is so burdensome and circuitous in its means that it could not survive even if it were viewed as an ordinary disclosure requirement (which it is not). *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). It is one thing to require someone engaged in commercial activity to provide "purely factual and uncontroversial information about the terms under which" the "services" it is offering "will be available." *Id.* at 651. But it is another thing entirely to compel someone engaged in speech, but not sales activity, to collect and disseminate information about other speakers. *See McManus*, 944 F.3d at 511, 515-17, 520-21 (applying heightened scrutiny to disclosure obligations placed on "online platforms" instead of advertisers themselves). There is a world of difference between requiring *The New York Times*

to disclose the terms on which it sells subscriptions and forcing it to investigate and police all its advertisers and demand that they make various disclosures. Yet Act 564 jumps those tracks, requiring online services to investigate and unearth information about third parties' off-platform transactions, and to extract from anyone who meets the "high volume" threshold information that the services themselves are then forced to convey. To the extent that can be understood as a "disclosure" requirement, it is the model of an "unduly burdensome" one. *NIFLA*, 585 U.S. at 776; *accord Zauderer*, 471 U.S. at 651.

68.    To be clear, *Zauderer* is not the right standard here, both because Act 564 contains far more than "disclosure" requirements, and because even those have nothing to do with the "services" of the *online marketplaces* themselves. But Act 564's inability to satisfy even the test for ordinary disclosure requirements underscores its unconstitutionality.

## COUNT THREE
### Unconstitutional Vagueness
### (42 U.S.C. §1983)

69.    NetChoice re-alleges and incorporates by reference the allegations stated in paragraphs 1-45 as though fully set forth herein.

70.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally

vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

71.    Act 564 fails to provide a person of ordinary intelligence with fair notice of what is prohibited. The Act redefines "high-volume third-party seller" as a person who brings in at least $5,000 through at least 200 discrete sales "*made by utilizing* [an] online marketplace." Act 564 §2(2) (emphasis added); *see id.* §2(4), (5) (similar). The Inform Consumers Act defines "online marketplace" in a manner that clearly covers Craigslist, Facebook Marketplace, Nextdoor, and OfferUp—and may even include Facebook itself. *See* O.C.G.A. §10-1-940(a)(3); *supra* ¶¶43-44. But Act 564 provides no guidance about what it means to make a sale "by utilizing" an online marketplace, leaving regulated parties to guess at the extent of their duty to investigate third-party sales and police third-party disclosures.

72.    While it is clear that Act 564 will require an online marketplace to attempt to monitor at least some third-party interactions and to determine whether those interactions resulted in sales (and, if so, the dollar value), it is totally unclear which additional third-party sales the Act sweeps in.  Is it limited to the countless items sold in person, typically for cash, through listings on a classifieds platform like OfferUp?  Does it also extend to purchases that result from clicking a third-party advertisement on a social-networking site like Facebook?  What about a consumer who buys a product by contacting a local artist through a Nextdoor business page?  There are millions and millions of sales each year that arguably "utilize" a service that meets Georgia's broad definition of "online marketplace," and Act 564 is entirely vague about which of these sales counts toward whether a given user is a "high-volume" seller.

73.    On top of that, it is unclear when a sale "made by utilizing" an inherently borderless marketplace occurs "in this state," Act 564 §2(2).  Does Georgia's expanded definition of "high-volume third-party seller" apply only to Georgia residents, or would it also apply to a third-party seller in another state who sells items to Georgians through OfferUp or Facebook Marketplace?  If the latter, does the out-of-state seller need to reach 200 discrete sales *to Georgians*, and to generate at least $5,000 *from Georgians*, or do sales to non-Georgians also count toward those "high volume" thresholds?  What about when a third-party seller in

Augusta sells an item to a buyer in Aiken, South Carolina?  Does whether the transaction counts toward Georgia's high-volume thresholds turn on which individual happens to drive across the state line?  And how is a regulated company supposed to find out the necessary facts to determine whether an in-person sale "made by utilizing" its online platform occurred "in this state" when the company's only involvement was providing an online forum for speech?  Act 564 provides no guidance on how to answer these and other questions, leaving NetChoice members to guess as to what they must do to comply.  This is not the "narrow specificity" that the Constitution requires of government regulations that burden speech.

74.     Moreover, to the extent the online marketplaces may subsequently be required to share the information they have gathered with the government, Act 564 raises Fourth Amendment concerns.  The Supreme Court has recognized a so-called "business records" doctrine that allows entities like telephone companies to report information generated in the ordinary course of business to the government without implicating the Fourth Amendment rights of the parties whose information is conveyed to the government.  *See Smith v. Maryland*, 442 U.S. 735, 742-45 (1979); *United States v. Miller,* 425 U.S. 435, 441-43 (1976).  But there is no precedent for forcing companies to gather information that they would not otherwise generate and then supply that information to the government to facilitate its law-enforcement efforts.

41

## COUNT FOUR
### Supremacy Clause – 47 U.S.C. §230 Preemption
### (42 U.S.C. §1983)

75.    NetChoice re-alleges and incorporates by reference the allegations stated in paragraphs 1-45 as though fully set forth herein.

76.    Under §230 of the Communications Decency Act ("CDA"), it is federal policy "to promote the continued development of the Internet" and "preserve the vibrant and competitive free market that presently exists," "unfettered" by "State regulation." 47 U.S.C. §230(b)(1), (2).  To that end, §230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* §230(c)(1).  And §230(e)(3) preempts "any State or local law that is inconsistent with this section." *Id.* §230(e)(3).

77.    As the Eleventh Circuit has recognized, the "majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service," including causes of action that threaten to impose liability on providers who "refrain from filtering or censoring the information on their sites." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 & n.3 (11th Cir. 2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).  While the Eleventh Circuit has not yet had occasion to weigh in on the full scope of §230(c)(1), at a

minimum, the provision prohibits states from imposing liability on an online service (such as Facebook Marketplace, Nextdoor, or OfferUp) for merely displaying and disseminating third-party content that it does not know is illegal. *See Airbnb, Inc. v. City of Bos.*, 386 F.Supp.3d 113, 123 (D. Mass. 2019) (holding that §230 preempts state law that "facially compel[led] [Airbnb] to monitor and remove third-party content").

78.    Unlike state laws that merely require sellers to disclose information to online marketplaces, or state laws that merely track the federal INFORM Act, Act 564's disclosure-policing obligations have the effect of imposing liability on covered websites even if they do nothing more than publish third-party content. The only way for those websites to comply with Act 564's requirement to "suspend any future sales activity" is by removing third-party listings and advertisements. By subjecting online marketplaces to liability for failing to do so, Act 564 runs straight into the rule that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1).

## PRAYER FOR RELIEF

NetChoice prays for the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. §2201, that Act 564 on its face

violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice and its members.

2.      A preliminary injunction enjoining Attorney General Carr, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Act 564 against any NetChoice member by any means, including by bringing a lawsuit under the Georgia Inform Consumers Act, O.C.G.A. §§10-1-940 through -945, as amended by Act 564.

3.      A permanent injunction enjoining Attorney General Carr, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Act 564 against any NetChoice member by any means, including by bringing a lawsuit under the Georgia Inform Consumers Act, O.C.G.A. §§10-1-940 through -945, as amended by Act 564.

4.      Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.      Any further relief that the Court deems just and proper.

Respectfully submitted, this 6th day of June 2024.

                                                      **/s/ Adam M. Sparks**

PAUL D. CLEMENT[*]                          JOYCE GIST LEWIS
Virginia Bar No. 37915                       Georgia Bar No. 296261
ERIN E. MURPHY[*]                            ADAM M. SPARKS
Virginia Bar No. 73254                       Georgia Bar No. 341578
JAMES Y. XI[*†]                              KANA A. CAPLAN
D.C. Bar No. 1617537                         Georgia Bar No. 612805
JOSEPH J. DEMOTT[*]                          TAYLOR A. CRESSLER
Virginia Bar No. 93981                       Georgia Bar No. 664099
CLEMENT & MURPHY, PLLC                        KREVOLIN & HORST, LLC
706 Duke Street                              1201 W. Peachtree St. NW
Alexandria, VA 22314                         Suite 3250
Tel: (202) 742-8900                          Atlanta, GA 30309
paul.clement@clementmurphy.com               Tel: (404) 888-9700
erin.murphy@clementmurphy.com                Fax: (404) 888-9577
james.xi@clementmurphy.com                   jlewis@khlawfirm.com
joseph.demott@clementmurphy.com              sparks@khlawfirm.com
                                             caplan@khlawfirm.com
[*] Pro hac vice application forthcoming     cressler@khlawfirm.com
[†] Supervised by principals of the firm
who are members of the Virginia bar

*Counsel for Plaintiff NetChoice, LLC*