# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

NETCHOICE, LLC,

     *Plaintiff*,

     v.

CHRISTOPHER M. CARR, in his
official capacity as Attorney General
of the State of Georgia,

     *Defendant*.

Case No. _____

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ....................................................................................1

BACKGROUND .......................................................................................3

    A.    NetChoice Members' Online Services...................................3

    B.    Uneven State-Level Regulation of Online Marketplaces ...................5

    C.    The Federal INFORM Act ..................................................6

    D.    Georgia's Radical Expansion of Its Inform Consumers Act................8

ARGUMENT .........................................................................................11

I.    NetChoice Is Likely To Succeed On The Merits Of Its Claims...................11

    A.    The Federal INFORM Act Preempts Act 564.....................................11

    B.    Act 564 Runs Afoul of the First Amendment ....................................15

        1.    Act 564 Triggers Heightened First Amendment Scrutiny........16

        2.    Act 564 Cannot Survive Heightened Scrutiny.........................18

    C.    Act 564 Is Unconstitutionally Vague.................................................22

II.    The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor Of Maintaining The Status Quo .........................................................24

CONCLUSION .....................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) .........................................................15

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ................................................................15

*Am. Libraries Ass'n v. Pataki,*
    969 F.Supp. 160 (S.D.N.Y. 1997) ......................................................15

*Ark. Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998) ...........................................................................16

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ...........................................................................22

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ..................................................................... 20, 21

*Carson v. Monsanto Co.,*
    72 F.4th 1261 (11th Cir. 2023) ..........................................................11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...........................................................................24

*FCC v. Fox TV Stations, Inc.,*
    567 U.S. 239 (2012) ...........................................................................22

*Georgia v. President of U.S.,*
    46 F.4th 1283 (11th Cir. 2022) ..........................................................25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ...........................................................................17

*Life Techs. Corp. v. Promega Corp.,*
    580 U.S. 140 (2017) ...........................................................................13

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ..................................................................... 18, 19

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ........................................................16

*NAACP v. Button*,
  371 U.S. 415 (1963) ........................................................22

*Nat'l Inst. of Fam. Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ................................................ 17, 22

*NetChoice, LLC v. Attorney Gen., Fla.*,
  34 F.4th 1196 (11th Cir. 2022) .................... 11, 16, 24, 25

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ........................................................19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ......................................................17

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ......................................................17

*Taylor v. Polhill*,
  964 F.3d 975 (11th Cir. 2020) ......................................11

*United States v. Williams*,
  553 U.S. 285 (2008) ......................................................22

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) ......................................................18

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ...................... 16, 18, 20, 21

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985) ................................................ 21, 22

**Statutes**

15 U.S.C. §45f..................................................................1

15 U.S.C. §45f(c)(2) ......................................................14

15 U.S.C. §45f(d)(1) ......................................................14

15 U.S.C. §45f(d)(2) ...................................................................................14

15 U.S.C. §45f(d)(3) ...................................................................................14

15 U.S.C. §45f(d)(4) ...................................................................................14

15 U.S.C. §45f(d)(5) ...................................................................................14

15 U.S.C. §45f(f)(3) ......................................................................... 7, 12, 13

15 U.S.C. §45f(f)(5) .....................................................................................7

15 U.S.C. §45f(f)(6) .....................................................................................7

15 U.S.C. §45f(g) ................................................................................. *passim*

O.C.G.A. §10-1-397(b) ..............................................................................11

O.C.G.A. §10-1-940 .....................................................................................1

O.C.G.A. §10-1-940(a)(2) ............................................................................5

O.C.G.A. §10-1-940(a)(3) ..................................................................... 10, 23

O.C.G.A. §10-1-940(a)(4) ............................................................................5

O.C.G.A. §10-1-940(a)(5) ............................................................................5

O.C.G.A. §10-1-941 ..................................................................................1, 5

O.C.G.A. §10-1-941(a) ...............................................................................17

O.C.G.A. §10-1-941(c) .................................................................................6

O.C.G.A. §10-1-942 ..................................................................................1, 6

O.C.G.A. §10-1-942(a) ...............................................................................17

O.C.G.A. §10-1-942(c) .................................................................................6

O.C.G.A. §10-1-942(d) .................................................................................6

O.C.G.A. §10-1-945(b) ...............................................................................11

Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2022) ................................6

2022 Ga. Laws Act 820 (S.B. 332)................................................................5

**Other Authorities**

Conflict, *Am. Heritage Dictionary of the Eng. Language*,
 https://archive.ph/zEk4r (last visited June 6, 2024) ............................................12

Conflict, *Merriam-Webster Dictionary*, https://archive.ph/xo7Dg
 (last visited June 6, 2024) ......................................................................12

Conflict, *Oxford English Dictionary* .......................................................................12

## INTRODUCTION

Georgia Act 564 imposes unprecedented and unconstitutional burdens on widely used online services that enable prospective buyers and sellers to communicate about potential in-person, offline sales. At present, the Georgia Inform Consumers Act ("GICA") requires "online marketplaces" to (1) retain information about third-party sales *for which payment was processed by the marketplace*; (2) use that information to identify "high-volume" sellers; and (3) require those sellers to make various disclosures. *See* O.C.G.A. §§10-1-940 through -942. These requirements mirror those of the federal INFORM Act, 15 U.S.C. §45f, and they sensibly apply only when an online marketplace processes payment for an on-platform sale (which generates the information necessary to comply). Effective July 1, under the guise of making minor definitional changes, Act 564 will radically expand online marketplaces' obligations under GICA by forcing them to keep track of all third-party sales of consumer products "in this state *made by utilizing* [an] online marketplace." Ex.A, Act 564 §2(2) (emphasis added). Absent judicial intervention, that change will transform GICA from a workable burden applicable to a limited set of e-commerce marketplaces into a nearly impossible requirement that all manner of online services—including those that merely facilitate third-party speech—investigate and retain information on sales occurring entirely off-platform.

Act 564 is invalid for multiple reasons. First, it is preempted by the federal

INFORM Act, which forbids any "State" from "establish[ing] or continu[ing] in effect any law, regulation, rule, requirement, or standard that conflicts with [its] requirements."  15 U.S.C. §45f(g).  Act 564 plainly "conflicts with" the INFORM Act, as it adopts a contradictory definition of the key statutory term—"high-volume third-party seller"—and thus dramatically expands the obligations of online marketplaces well beyond what Congress permitted.  Those radically expanded obligations vitiate Congress' express intent to create a single, nationwide rule for national marketplaces, which invariably operate across state borders.  Second, Act 564 violates the First Amendment.  Its onerous regulations significantly burden speech, triggering at least intermediate scrutiny, which Act 564 plainly flunks. Forcing online marketplaces to investigate off-platform activity, obtain and maintain sensitive information that they would not ordinarily collect, and ensure that third parties comply with disclosure obligations that the state does not directly impose or enforce on sellers (who actually have the requisite data), is not remotely tailored to further the state's asserted interest in "combating organized retail crime," Act 564 §1 (capitalization altered).  Third, Act 564 is unconstitutionally vague, as it provides no guidance about what it means to make a sale "by utilizing" an online marketplace "in this state."  And vagueness in this context inevitably chills the speech of online marketplaces and sellers alike.

The equities tilt decisively in NetChoice's favor.  If forced to try to comply

with the law, NetChoice members would suffer irreparable injury in at least two forms: (1) the loss of First Amendment freedoms; and (2) massive, unrecoverable expenditures of resources. And users of online services would lose First Amendment freedoms as well, as Act 564's substantial penalties and enormous practical burdens will inevitably cause NetChoice members to remove content. In contrast, Georgia has no valid interest in enforcing an unconstitutional law, and GICA as it exists today and the federal INFORM Act (which this lawsuit does not challenge) will adequately protect any valid state interests if Act 564 is enjoined.

The Court should preliminarily enjoin Attorney General Carr, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Act 564 against NetChoice members. NetChoice respectfully asks the Court to issue the injunction before Act 564 takes effect on July 1, 2024.

## BACKGROUND

### A.    NetChoice Members' Online Services.

NetChoice is an Internet trade association whose members operate a variety of popular online services. Ex.B ¶¶3-4. Several NetChoice members, including Amazon, eBay, and Etsy, operate e-commerce marketplaces where consumers can purchase products from third-party sellers practically anywhere in the country and complete the sale online. Ex.B ¶4. The marketplace processes the payment and charges the seller a fee, which is calculated as a percentage of the total sales price.

Ex.1; Ex.2; Ex.3.[1]

Other services operated by NetChoice members, including Facebook Marketplace, Nextdoor, and OfferUp, operate in the space that was once dominated by classified advertisements in print newspapers. These platforms enable users to market items online and then sell them offline (often for cash) to buyers in their local community. Ex.C ¶¶12-13; Ex.D ¶¶3-7; Ex.4; Ex.5; Ex.6; Ex.7. Because Facebook Marketplace, Nextdoor, and OfferUp are not involved in these offline sales, they have no realistic way to track which listed items are sold—much less where they are sold, to whom, or for how much. Ex.C ¶14; Ex.D, ¶8; Ex.7.

NetChoice members also operate social networking services. On Facebook, users can post status updates, photos, videos, and links; follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities); join Groups or attend Events that relate to topics of interest; post ads; and privately message one another via Meta's Messenger app. Ex.C ¶7. While these features are not specifically designed for promoting, buying, and selling products, they are often used for such purposes. Ex.C ¶16. On Nextdoor, users are placed in a neighborhood based on their address and automatically receive updates from nearby neighbors, businesses, and public services. Ex.8. Among other things, Nextdoor allows a merchant (1) to create a "business page" through which it can market its products to

---

[1] All numbered exhibits are attached to Exhibit E, Declaration of Adam M. Sparks.

local Nextdoor users; (2) to post content on users' "newsfeed"; and (3) to run paid advertisements.  Ex.9.

**B.      Uneven State-Level Regulation of Online Marketplaces.**

In recent decades, online shopping has grown exponentially.  In the absence of federal legislation regulating online marketplaces, states started to step in— Georgia among them.  In May 2022, Georgia enacted GICA.  *See* 2022 Ga. Laws Act 820 (S.B. 332) (codified at O.C.G.A. §§10-1-940 through -945).  GICA's linchpin is its definition of "high-volume third-party seller," which determines the extent of the regulatory burden on online marketplaces and their users.  The statute defines "high-volume third-party seller" as "a person"—other than the owner or operator of the online marketplace—"who sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform," and, "in any continuous 12 month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products of an aggregate total of $5,000.00 or more in gross revenues in this state made through the online marketplace."  *Id.* §10-1-940(a)(2), (4), (5).

GICA requires online marketplaces (1) to collect contact information, a bank account number, and a tax identification number from any "high-volume third-party seller" and (2) verify that information and periodically prompt the high-volume seller to keep it up to date.  O.C.G.A. §10-1-941.  For most, this tax identification

number is a Social Security Number ("SSN").  GICA further provides that "an online marketplace shall require any high-volume third-party seller with an aggregate total of $20,000.00 or more in annual gross revenues on its platform to provide to the online marketplace and disclose to consumers in a clear and conspicuous manner" its full name, its physical address, contact information "that will allow for direct, unhindered communication with such seller by consumers," and "[w]hether the high-volume third-party seller used a different seller to supply the product to the consumer upon purchase."  *Id.* §10-1-942.  If the seller does not comply, the marketplace must "suspend any future sales activity of such seller."  *Id.* §§10-1-941(c), -942(c)-(d).  Georgia does not impose or enforce this disclosure obligation on the third-party seller directly, but instead puts those burdens on the online marketplaces and punishes them (and not the sellers) for non-compliance.

By September 2022, 12 other states had enacted similar, but not identical, statutes.  *See* Dkt.1 ("Compl.") ¶¶26, 27 & n.15.  While all 13 state "Inform Consumers" statutes use the same "high-volume" thresholds, there are a host of other differences among them, which created an uneven patchwork of state-level regulation of online marketplaces.  *See* Compl. ¶¶27-28.

C.    **The Federal INFORM Act.**

In December 2022, Congress stepped in, enacting the federal INFORM Act. *See* Pub. L. No. 117-328, §301, 136 Stat. 4459, 5555-62 (Dec. 29, 2022) (codified

at 15 U.S.C. §45f).  In doing so, Congress replaced the emerging patchwork of state-by-state regulation with a single, nationwide framework.  *See* Compl. ¶¶29-37.

Like the state laws that preceded it, the federal INFORM Act defines "high-volume, third party seller" as a person who "sells, offers to sell, or contracts to sell a consumer product through an online marketplace's platform" and "in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and an aggregate total of $5,000 or more in gross revenues."  15 U.S.C. §45f(f)(3), (5)-(6).

Importantly, the federal INFORM Act limits its scope to transactions "made through the online marketplace and for which payment was processed by the online marketplace," *id.* §45f(f)(3)(B), as opposed to off-platform transactions conducted directly by private parties.  The INFORM Act thus sensibly requires online marketplaces to collect, maintain, and ensure dissemination of sellers' information only when they, as payment processors, have ready access to the relevant data to determine who qualifies as a "high-volume third party seller."

Congress underscored its intent to supplant the existing state-by-state patchwork by enacting a broad express-preemption clause:  "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section."  *Id.* §45f(g).  Congress' decision to expressly preempt

state regulations reflects the reality that online marketplaces invariably operate across state lines. The express-preemption clause played a vital role in marshaling political support for the law. For example, NetChoice initially raised concerns about the law, but ultimately concluded in light of the express-preemption provision that the law reflected a sensible "compromise" that "avoid[s] a complex patchwork of state laws related to seller vetting." Ex.10; *cf.* Ex.11. Amazon and eBay likewise supported the INFORM Act because they recognized that it would "establish[] a federal standard, preventing an unworkable patchwork of state-level regulations." Ex.12; *see* Ex.13. And most states appear to understand that the federal INFORM Act broadly preempts state-law analogs, as no state has enacted or enforced any conflicting requirement since the law's passage—at least until now.

### D.    Georgia's Radical Expansion of Its Inform Consumers Act.

Georgia did not get the message. On May 6, 2024, Governor Kemp signed Act 564 (formerly known as S.B. 472), which dramatically expands the scope of— and the regulatory burdens imposed by—GICA and jumps the tracks between permissible recordkeeping and disclosure obligations as to readily available data and impermissible investigation mandates. Act 564 is set to take effect on July 1, 2024.

In its original (and, until July 1, present) form, GICA specifies that, when determining whether a third-party seller has met the "high-volume" thresholds, the online marketplace need only count transactions "for which payment was processed

by the online marketplace or through a third party." O.C.G.A. §10-1-940(a)(2). This limitation is critical to ensuring that the Act's burdens are reasonable and constitutional. After all, it is relatively easy for a company that handles payment processing (like Amazon or eBay) to identify high-volume sellers, as the company can readily track each user's total sales and gross revenue based on existing records of *online* transactions. But it would be extraordinarily burdensome (and likely impossible) for companies like Meta Platforms, Nextdoor, and OfferUp to gather accurate information about which third-party listings lead to *off-platform* transactions between two private parties, where payment is often made in cash, for amounts that may not even have been determined through online communications. Ex.C ¶¶35-45; Ex.D ¶¶25-32. Yet Act 564 removes this crucial payment-processing guardrail, expanding the Georgia statute's coverage to encompass all sales "*made by utilizing* [an] online marketplace." *See* Act 564 §2(2) (emphasis added).

Consequently, as of July 1, 2024, Georgia will require that classifieds platforms such as Facebook Marketplace, Nextdoor, and OfferUp investigate, maintain information about, and impose and police disclosure obligations on third-party sellers based on sales that occur entirely offline—in-person, cash transactions that these classifieds platforms have no realistic way to monitor. To even attempt to comply, a classifieds platform would need to ask every individual who lists an item whether the listing led to a sale, where the sale occurred, and what the buyer paid.

But the platform would have no realistic way of requiring sellers to answer those questions—or of knowing whether those who respond are telling the truth. And if platforms have no feasible way to confidently determine who is a "high-volume" seller (which seems likely), then they will be forced to remove protected speech to avoid the risk of noncompliance. Ex.C ¶¶41-45; Ex.D ¶31.

Moreover, Act 564 is so broadly worded that it appears to encompass not only individuals who post a "for sale" listing on classifieds platforms, but also those who advertise products for sale, whether formally or informally, on social-networking services such as Facebook and Nextdoor—both of which arguably meet Georgia's broad statutory definition of "online marketplace." *See* O.C.G.A. §10-1-940(a)(3); Compl. ¶¶20, 43. Act 564 thus appears to require these online services to track all activity on their sites that might lead to an off-platform sale, investigate whether such sales occur, collect enough information about those sales to determine who is a "high volume seller," then maintain and compel disclosure of information about those who meet that threshold. This would be hugely burdensome, if not impossible.

Act 564 imposes harsh penalties for noncompliance. While Georgia does not impose or enforce any disclosure obligations on the high-volume third-party sellers themselves, an online marketplace that fails to collect the required information from a "high-volume third-party seller" or mandate and convey the required consumer-facing disclosures commits "an unfair or deceptive act or practice in violation of the

Georgia Fair Business Practices Act." Ex.14. As Attorney General Carr has emphasized, this "could result in the imposition of significant civil penalties"—up to $5,000 *per violation*, even if there is no evidence of actual harm to consumers. *Id.*; *see* O.C.G.A. §§10-1-945(b), -397(b).

## ARGUMENT

NetChoice is entitled to a preliminary injunction if it shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. *See NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196, 1209 (11th Cir. 2022). A preliminary injunction is amply warranted here. NetChoice is overwhelmingly likely to succeed on the merits of its claims, and the other preliminary injunction factors tip decidedly in favor of maintaining the status quo.

## I. NetChoice Is Likely To Succeed On The Merits Of Its Claims

### A. The Federal INFORM Act Preempts Act 564.

Under the Supremacy Clause, "state laws that interfere with, or are contrary to, federal law" are invalid. *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020). When, as here, "Congress has enacted an express-preemption provision," the court must "identify the state law that it preempts according to ordinary principles of statutory interpretation." *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc). Here, the text, context, statutory structure, and common sense all

point to the same conclusion:  The federal INFORM Act preempts Act 564.

Start with the text.  The INFORM Act's express-preemption clause provides: "No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section."  15 U.S.C. §45f(g).  In ordinary usage, the verb "conflict" connotes that two things are "different" or "fail to be in agreement or accord."  Conflict, *Merriam-Webster Dictionary*, https://archive.ph/xo7Dg (last visited June 6, 2024); *accord* Conflict, *Am. Heritage Dictionary of the Eng. Language*, https://archive.ph/zEk4r (last visited June 6, 2024) (to "differ"); Conflict, *Oxford English Dictionary* ("to clash"; "to be at variance").

There can be no serious dispute that Georgia's new third-party-seller rules are "different" from, and not "in agreement or accord" with, Congress' third-party seller rules.  Act 564 and the INFORM Act adopt strikingly divergent definitions of the exact same legal term—a term that is critical to defining the scope of the legal obligations the laws impose.  Whereas federal law defines "high-volume third-party seller" as one who achieves the requisite volume of sales (1) "made through [an] online marketplace"; and (2) "for which *payment was processed by the online marketplace*, either directly or through its payment processor," 15 U.S.C. §45f(f)(3) (emphasis added), Georgia now defines that term as anyone who achieves the requisite volume of sales "by utilizing [an] online marketplace," Act 564 §2(2).

This is no small difference. Georgia's definition is vastly broader than Congress', as it sweeps in not just transactions "processed by [an] online marketplace," 15 U.S.C. §45f(f)(3), but countless transactions where a classifieds platform or other online service was merely "utilized"—even if sales took place entirely off-platform or entirely in cash. *See* Compl. ¶¶38-44; Ex.C ¶30-31; Ex.D ¶22-24. That difference is fundamental, as the federal requirement is sensibly limited to information that a regulated entity is likely to possess, or can readily collect, by virtue of the payment-processing role it has chosen to take on. Georgia's requirement, by contrast, extends well beyond transactions in which the regulated entity processes payment, and thus amounts to an onerous obligation to investigate private parties' independent off-platform dealings. There is thus unquestionably a clear "conflict"—that is, a difference or disagreement—between the requirements chosen by Congress and the requirements imposed by Act 564.

The phrases surrounding "conflict" in §45f(g) reinforce Congress' broad preemptive intent. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) ("[A] word is given more precise content by the neighboring words with which it is associated."). The clause defines the political entities to which it applies in the broadest possible terms: Its preemptive effect reaches every "State," "political subdivision of a State," and "territory of the United States." 15 U.S.C. §45f(g). The clause also describes *what* is preempted in the broadest possible terms—"any law,

regulation, rule, requirement, or standard." *Id.* The clause's temporal reach is similarly expansive. It forbids states not only from "establish[ing]" new measures but also from "continu[ing]" existing measures "in effect." *Id.* The breadth of these neighboring phrases confirms that the INFORM Act's preemption clause has a wide scope that readily encompasses Act 564.

The INFORM Act's enforcement provisions support reading its preemption clause as displacing any inconsistent state requirement, as they expressly contemplate that the FTC and state attorneys general will work together to enforce a single federal standard. *See* 15 U.S.C. §45f(c)(2)(A), (d)(1). Indeed, the Act takes pains to ensure that federal and state authorities do not initiate duplicative or overlapping actions. When a state attorney general brings a suit to enforce the INFORM Act, he or she must notify the FTC, which is expressly authorized to intervene and "be heard on all matters arising therein." 15 U.S.C. §45f(d)(2), (3). Similarly, once the FTC initiates an enforcement action against a defendant, a state may join that action but may not file a separate action. *Id.* §45f(d)(4)-(5). Those provisions presuppose that states cannot impose burdens on online marketplaces vis-à-vis off-platform transactions that the federal law leaves unregulated.

The historical context confirms that the federal INFORM Act precludes states from adopting their own, divergent standards. As explained, the federal law followed a wave of state laws imposing similar—but not identical—requirements.

*Supra* pp.6-7; Compl. ¶¶21-28.  That patchwork of state-level regulation prompted Congress to act.  *Supra* pp.7-8; Compl. ¶¶29-37.  That is hardly surprising; as courts have emphasized time and again, when it comes to inherently interstate technology like the Internet, federal rules are generally preferable to state ones.  *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999).  Indeed, given the impracticality of complying with 50 state laws and 50 different standards, allowing state-by-state legislation would likely make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Commerce Clause concerns.  *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160, 183 (S.D.N.Y. 1997).

In short, the tools of statutory interpretation overwhelmingly demonstrate that Congress created a single, nationwide standard to regulate online marketplaces that connect prospective buyers and third-party sellers, expressly preempting states from adopting their own, divergent standards.  Accordingly, Act 564 is preempted.

### B.     Act 564 Runs Afoul of the First Amendment.

Act 564 violates the First Amendment.  It triggers heightened scrutiny by imposing major burdens on the rights to speak, listen, and associate.  And its exceedingly onerous obligations imposed on speakers—and not sellers engaged in the potential illegal activity it targets—cannot begin to satisfy that scrutiny.  Indeed, it is so burdensome that it would violate the First Amendment even if viewed as an

ordinary disclosure requirement (and there is nothing ordinary about it).

1.    **Act 564 Triggers Heightened First Amendment Scrutiny.**

Act 564 triggers heightened scrutiny in multiple ways.  First, it impinges on the First Amendment rights of companies that operate online marketplaces, i.e., NetChoice's members.  Just as the First Amendment protects a newspaper's right to disseminate advertisements, it protects NetChoice members' right to disseminate third-party sellers' speech and to exercise editorial discretion regarding the listings, advertisements, and other content they wish to disseminate and display on their own websites.  *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *NetChoice*, 34 F.4th at 1213-14, 1216-17.  Act 564 severely burdens those expressive activities by forcing those engaged in them (1) to investigate and maintain information about third-party sales that occur entirely off-platform, which they otherwise would have no reason or ability to track; (2) to mandate and carry disclosures by "high-volume third-party sellers"; and (3) to verify the accuracy of such information and disclosures.  By so requiring, Act 564 "exacts a penalty" from those who choose to disseminate third-party speech that entails any kind of offer of an item for sale (which of course is itself protected speech).  *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).  Laws that impose such burdens on constitutionally protected speech are subject to heightened First Amendment scrutiny.  *See Wash. Post v. McManus*, 944 F.3d 506, 515-17 (4th Cir. 2019) (state

law requiring "online platforms" to publicly post certain facts about the paid advertisements they carry triggered heightened scrutiny because it "deter[ed] hosting" such constitutionally protected speech); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

Second, Act 564 compels speech—multiple times over. For one, it forces online marketplaces to require anyone who could potentially qualify as a high-volume seller based on off-platform activity to turn over information sufficient for the online marketplace to make a judgment about whether further disclosures are mandated. For another, if the third party qualifies as a high-volume seller, Act 564 mandates disclosure of personal information, including sensitive items such as bank information and SSNs, to online marketplaces. O.C.G.A. §10-1-941(a). Finally, it forces some of those sellers to provide—and online marketplaces to convey— consumer-facing disclosures. *Id.* §10-1-942(a). Time and again, the Supreme Court has applied heightened scrutiny to laws that compel speech, including "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *see Nat'l Inst. of Fam. Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 773-75 (2018); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-801 (1988).

Third, Act 564 will inevitably result in the suppression of significant amounts

of constitutionally protected user posts and item listings on the online services it regulates. Ex.C ¶¶41-45; Ex.D ¶¶31-32. Act 564 will prompt some users to refrain from perfectly legitimate speech to avoid having to hand over their bank information and SSNs to online marketplaces commandeered to act as the state's enforcement agents. Ex.D ¶29. Moreover, given the steep compliance costs and hefty civil sanctions for non-compliance, online services will inevitably conclude that some user content they would otherwise display and disseminate raises too many risks. *See McManus*, 944 F.3d at 516-517. The law thus not only overrides the online marketplaces' editorial discretion and restricts potential high-volume sellers' right to speak, but also burdens the First Amendment rights of users of online marketplaces who would willingly view the suppressed listings and advertisements. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (permitting bookseller to vindicate "the First Amendment rights of bookbuyers").

### 2. Act 564 Cannot Survive Heightened Scrutiny.

Act 564 burdens both non-commercial and commercial speech, and thus unquestionably triggers at least intermediate scrutiny, which requires the state to show that the law is "narrowly tailored to achieve" a substantial governmental interest.[2] *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *see also*

---

[2] NetChoice reserves the right to argue that strict scrutiny applies because (1) Act 564 burdens more than just commercial speech and (2) its heavy burdens on

*Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017). It cannot pass that test.

The Georgia Attorney General's official website describes GICA as an effort "to prevent criminals from selling stolen goods on any online marketplace platforms and to protect Georgians who unknowingly purchase these stolen and counterfeit goods." Ex.14. Act 564 purports to advance these same goals. *See* Act 564 §1 ("This Act shall be known and may be cited as the 'Combating Organized Retail Crime Act.'"); Ex.15. While the state undoubtedly has a legitimate interest in combating organized retail crime and helping consumers avoid stolen or counterfeit goods, Act 564 is not remotely tailored to advance those interests.

To begin, Act 564 is wildly overinclusive; it burdens huge swathes of constitutionally protected expression that have nothing to do with "organized retail crime." Instead of targeting misleading or unlawful speech (or even consummated sales), the Act imposes onerous obligations on online marketplaces—even classifieds platforms that do not participate in transactions and instead merely provide a forum for third-party speech that may or may not culminate in an off-platform sale. And because it is practically impossible for classifieds platforms and other online services to monitor the huge volume of *off-platform* transactions that their services in some way facilitate, which is essential to determine who is a "third

_____

protected expression should receive strict scrutiny regardless of whether it affects only "commercial speech." *See Lorillard Tobacco*, 533 U.S. at 572 (Thomas, J., concurring in part and concurring in the judgment).

party seller" under Act 564, the law will almost certainly force them to suppress speech that they would prefer to carry and that have zero connection to retail theft or other unlawful conduct. *See* Ex.C ¶¶41-45; Ex.D ¶¶31-32; *cf. McManus*, 944 F.3d at 510 (attempt to combat foreign election interference by forcing "online platforms" to disclose information about third-party political ads was "too circuitous and burdensome" to satisfy heightened scrutiny).

On the flipside, Act 564 is "wildly underinclusive when judged against its asserted justification." *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). Notwithstanding its title, the Act does not even prohibit (much less prevent) "organized retail crime" or impose any civil or criminal penalty on individuals who traffic in stolen, counterfeit, or dangerous consumer goods. Indeed, it does not even *directly* regulate third-party sellers at all. Rather than require high-volume sellers, who have ready information about the volume, nature, and location of their own sales, to make certain disclosures whenever and wherever they offer an item for sale, Act 564 instead imposes obligations and potential penalties *solely* on websites engaged in speech (but not the processing of sales). Regulating speakers rather than those involved in the primary activity the state purports to target is the antithesis of narrow tailoring. This misdirection of the Act's obligations and penalties will render it nearly useless in stopping illegal sales by organized criminals. It will take little effort for those actual criminals to evade the law. At most, Act 564 might

inconvenience them by impelling them to conduct more of their illegal activities entirely offline, to spread their online transactions among several different websites, or to create multiple "seller" accounts. "That is not how one addresses a serious social problem." *Id.* at 802.

Indeed, Act 564 is so burdensome and circuitous in its means that it could not survive even if it were viewed as an ordinary disclosure requirement (which it is not). *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). It is one thing to require someone engaged in commercial activity to provide "purely factual and uncontroversial information about the terms under which" the "services" it is offering "will be available." *Id.* at 651. But it is another thing entirely to compel someone engaged in speech, but not sales activity, to collect and disseminate information about other speakers. *See McManus*, 944 F.3d at 511, 515-17, 520-21 (applying heightened scrutiny to disclosure obligations placed on "online platforms" instead of advertisers themselves). There is a world of difference between requiring *The New York Times* to disclose the terms on which it sells subscriptions and forcing it to investigate and police all its advertisers and demand that they make various disclosures. Yet Act 564 jumps those tracks, requiring online services to investigate and unearth information about third parties' off-platform transactions, and to extract from anyone who meets the "high volume" threshold information that the services themselves are then forced to convey. To the extent

that can be understood as a "disclosure" requirement, it is the model of an "unduly burdensome" one. *NIFLA*, 585 U.S. at 776; *accord Zauderer*, 471 U.S. at 651.

### C.    Act 564 Is Unconstitutionally Vague.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Act 564 fails to provide a person of ordinary intelligence with fair notice of what is prohibited. The Act redefines "high-volume third-party seller" as a person who brings in at least $5,000 through at least 200 discrete sales "*made by utilizing* [an] online marketplace." Act 564 §2(2) (emphasis added); *see id.* §2(4), (5)

(similar). GICA defines "online marketplace" in a manner that clearly covers Craigslist, Facebook Marketplace, Nextdoor, and OfferUp—and may even include Facebook itself. *See* O.C.G.A. §10-1-940(a)(3); Ex.C ¶24; Compl. ¶¶43-44. But Act 564 provides no guidance about what it means to make a sale "by utilizing" one of these online services, leaving regulated parties to guess at the extent of their duty to investigate third-party sales and police third-party disclosures.

While it is clear that Act 564 will require an online marketplace to monitor at least some third-party sales for which it does not process the payment, it is totally unclear which additional third-party sales the Act sweeps in. *See* Ex.C ¶¶31, 39-40; Ex.D ¶¶23-24. Is it limited to the countless items sold in person, typically for cash, through listings on a classifieds platform like OfferUp? Does it also extend to purchases that result from clicking a third-party advertisement on a social-networking site like Facebook? What about a consumer who buys a product by contacting a local artist through a Nextdoor business page? There are millions and millions of sales each year that arguably "utilize" a service that meets Georgia's broad definition of "online marketplace," and Act 564 is entirely vague about which of these sales counts toward whether a given user is a "high-volume" seller.

On top of that, it is unclear when a sale "made by utilizing" an inherently borderless marketplace occurs "in this state," Act 564 §2(2). *See* Ex.C ¶¶33-34; Ex.D ¶23. Does Georgia's new definition of "high-volume third-party seller" apply

only to Georgia residents, or would it also apply to a third-party seller in another state who sells items to Georgians through OfferUp or Facebook Marketplace? If the latter, does the out-of-state seller need to reach 200 discrete sales *to Georgians*, and to generate at least $5,000 *from Georgians*, or do sales to non-Georgians also count toward those "high volume" thresholds? Act 564 provides no guidance on how to answer these and other questions, leaving NetChoice members to guess as to what they must do to comply. This is not the "narrow specificity" that the Constitution requires of government regulations that burden speech.

## II.   The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor Of Maintaining The Status Quo.

When determining whether a preliminary injunction is appropriate, "likelihood of success on the merits 'is generally the most important of the four factors.'" *NetChoice*, 34 F.4th at 1231. But the other preliminary injunction factors tip decidedly in favor of maintaining the status quo as well.

NetChoice members face two distinct forms of irreparable harm. First, not only NetChoice members but also the millions of Georgians who use their services will suffer irreparable harm in the form of a constitutional violation. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *NetChoice*, 34 F.4th at 1231 (similar). Second, to comply with Act 564, companies will have to devote massive amounts of resources to establish, test, and implement

processes to monitor hundreds of millions of listings to determine which may have led to off-platform sales, where the sales occurred, and what the buyer paid. Ex.C ¶40; Ex.D ¶27. Even if that were feasible, it would be extremely costly, and there is no way to recover those costs if the Court were to ultimately determine that Act 564 is unlawful. *See Georgia v. President of U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022) ("unrecoverable monetary loss is an irreparable harm").

The balance of equities and the public interest both favor a preliminary injunction as well, as "neither the government nor the public has any legitimate interest in enforcing an unconstitutional" law. *NetChoice*, 34 F.4th at 1231. Our "system does not permit" the government "to act unlawfully even in pursuit of desirable ends." *Georgia*, 46 F.4th at 1303. The state, moreover, has "many other tools" at its "disposal" for advancing its asserted interests while the parties litigate the merits of NetChoice's claims, *id.*, including by enforcing the federal INFORM Act and existing laws prohibiting retail theft and counterfeiting. Finally, the public interest would be affirmatively harmed if the law took effect, as companies may be forced to remove all sorts of otherwise unproblematic listings in Georgia out of an abundance of caution. *See* Ex.C ¶¶43-45; Ex.D ¶¶31-32. All relevant factors thus tip strongly in favor of maintaining the status quo.

## CONCLUSION

The Court should preliminarily enjoin Georgia from enforcing Act 564.

Respectfully submitted, this 6th day of June 2024.

/s/ **Adam M. Sparks**

| | |
|---|---|
| PAUL D. CLEMENT* | JOYCE GIST LEWIS |
| Virginia Bar No. 37915 | Georgia Bar No. 296261 |
| ERIN E. MURPHY* | ADAM M. SPARKS |
| Virginia Bar No. 73254 | Georgia Bar No. 341578 |
| JAMES Y. XI*† | KANA A. CAPLAN |
| D.C. Bar No. 1617537 | Georgia Bar No. 612805 |
| JOSEPH J. DEMOTT* | TAYLOR A. CRESSLER |
| Virginia Bar No. 93981 | Georgia Bar No. 664099 |
| CLEMENT & MURPHY, PLLC | KREVOLIN & HORST, LLC |
| 706 Duke Street | 1201 W. Peachtree St. NW |
| Alexandria, VA 22314 | Suite 3250 |
| Tel: (202) 742-8900 | Atlanta, GA 30309 |
| paul.clement@clementmurphy.com | Tel: (404) 888-9700 |
| erin.murphy@clementmurphy.com | Fax: (404) 888-9577 |
| james.xi@clementmurphy.com | jlewis@khlawfirm.com |
| joseph.demott@clementmurphy.com | sparks@khlawfirm.com |
| | caplan@khlawfirm.com |
| | cressler@khlawfirm.com |

* Pro hac vice application forthcoming
† Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiff NetChoice, LLC*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Local Rule 7.1D, the undersigned counsel hereby certifies that the foregoing ***Memorandum In Support Of Motion For Preliminary Injunction*** complies with the font and point selections approved by the Court in Local Rule 5.1C. This document was prepared on a computer using Times New Roman font (14 point).

This 6th day of June 2024.

<u>**/s/ Adam M. Sparks**</u>
Adam M. Sparks
*Counsel for Plaintiff*