**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| NETCHOICE, LLC,<br>   Plaintiff,<br>           v.<br>CHRISTOPHER M. CARR, in his official capacity as Attorney General of the State of Georgia,<br>   Defendant. | Civil Action No.<br>1:24-cv-02485-SDG |

**OPINION AND ORDER**

Plaintiff NetChoice, LLC, a trade association that represents the interests of various internet companies, brings this case against the Attorney General of the State of Georgia to challenge a Georgia law—Act 564—which is scheduled to go into effect on July 1, 2024. Immediately before the Court is NetChoice's Motion for Preliminary Injunction [ECF 2], which argues that Act 564 should be enjoined from enforcement because it is preempted by the federal INFORM Act, unduly burdens various First Amendment rights, and is unconstitutionally vague. After careful consideration and with the benefit of oral argument, the Court **GRANTS** the motion on federal preemption grounds.

**I.  Background**

To state the obvious, there has been a drastic increase in online consumer transactions over the past decades. Increased online transactions have led to increased sales of stolen and counterfeit goods. It should come as no surprise, then,

1

that attempts to regulate these transactions and inevitable ancillary issues have followed. Several individual states took the first swing at regulation. Relevant here is the Georgia Inform Consumers Act (GICA), enacted in May 2022. O.C.G.A. §§ 10-1-940 through 942. GICA promulgated disclosure requirements for third-party, high-volume sellers operating on online marketplaces. O.C.G.A. §§ 10-1-941. The current iteration of GICA defines a high-volume third-party seller as one that reaches the requisite transaction minimums on sales "made through the online marketplace and for which payment was processed by the online marketplace or through a third party." *Id*.

With a handful of state regulations enacted and even more percolating, in December 2022, the federal government jumped in, enacting the Integrity, Notification, and Fairness in the Online Retail Marketplace for Consumers—or INFORM—Act. 15 U.S.C. § 45f. Much like GICA, the INFORM Act seeks to bring transparency to online transactions and to deter sales of stolen, counterfeit, and dangerous products. It requires "high-volume third-party seller[s] on [an] online marketplace's platform[s]" to provide certain information to the marketplace. 15 U.S.C. § 45f(a)(1)(A).

Notably, the INFORM Act also includes an explicit preemption clause. 15 U.S.C. § 45f(g). It provides that "[n]o State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law,

regulation, rule, requirement, or standard that conflicts with the requirements of this section." *Id.*

The definition and scope of a "high-volume, third-party seller" for purposes of both the federal and Georgia laws is a critical point of contention in this case. Both GICA and the INFORM Act define a "high volume, third-party" seller as a person who, in any continuous 12-month period during the previous 24 months, has entered into 200 or more discrete sales or transactions of new or unused consumer products and has an aggregate total of $5,000 or more in gross revenues. *Compare* 15 U.S.C. § 45f(f)(3) *with* O.C.G.A. § 10-1-940(a)(2). Both also define making a sale "through" an online platform as one for which "payment was processed by the online marketplace." 15 U.S.C. § 45f(f)(3)(B). The INFORM Act, however, makes this clear through a special provision. It clarifies that "[f]or purposes of calculating the number of discrete sales or transactions . . . an online marketplace shall *only be required* to count sales or transactions made through the online marketplace and for which payment was processed by the online marketplace, either directly or through its payment processor." *Id.* § 45f(f)(3)(B). In other words, the current versions of both the federal and Georgia laws limit their requirements, and thus their enforcement scope, to online marketplaces where the transfer of payment actually occurs *through* the platform itself (or the platform's payment processor).

This stands in contrast to websites that might facilitate sales, but do not themselves permit or process the exchange of money for products. NetChoice analogizes such websites to the classified ads section of a newspaper.[1] Such sites—Facebook Marketplace, Nextdoor, and Craigslist, to name a few—allow users to create posts offering items for sale. They also incorporate messaging functions that allow buyers and sellers to communicate about a potential sale.[2] The exchange of money, however, does not take place on or through the site.[3] Presumably, the seller and a prospective buyer perusing the post communicate with one another (sometimes through the website, but sometimes not) and informally determine the presumptive terms of the transaction—like where and when it will take place, and the appropriate form and amount of compensation.

In May 2024, approximately 18 months after passage of the INFORM Act, the State of Georgia amended GICA by passing Act 564. Instead of only requiring online marketplaces to regulate transactions made "through" the online marketplace "for which payment was processed by the online marketplace or through a third party," GICA will now regulate all transactions "entered into . . .

---

[1]   ECF 1, ¶¶ 16–18.

[2]   *Id.*

[3]   *Id.*

by utilizing" an online marketplace.[4] The changes are intended to sweep into the fold transactions that, according to Georgia, are "entered into" on the online marketplace (which is not defined in the statute itself) but where the currency/product exchange occurs in person. NetChoice asserts that the law will now apply to all off-platform transactions that in some way use an online marketplace.[5]

Frustrated by Act 564's expansion to such off-platform transactions, NetChoice filed suit and seeks the instant preliminary injunction to prevent it from coming into effect.[6]

## II.   Preliminary Injunction Standard

To obtain preliminary injunctive relief, the moving party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210

---

[4]   ECF 2-2, at 2–3.

[5]   ECF 1, ¶¶ 38–43.

[6]   Georgia Attorney General Carr is responsible for enforcing GICA. This is the proper party to sue when seeking prospective equitable relief to end asserted violations of federal law. *Ex parte Young*, 209 U.S. 123 (1908).

(11th Cir. 2003). In determining whether a preliminary injunction is warranted, "a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Nonetheless, a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

### III.  Discussion

The Court first addresses NetChoice's likelihood of success on the merits before addressing the remaining injunctive relief factors.

#### A.  **NetChoice is likely to succeed on the merits because Act 564 is preempted by the federal INFORM Act.**

NetChoice advances three arguments in support of its motion: Act 564 is preempted, violates the First Amendment, and is unconstitutionally vague. Because the Court concludes that Act 564 is preempted, it need not address the First Amendment or vagueness doctrine arguments.[7]

When a state law conflicts with a federal one, the federal law reigns supreme. U.S. CONST. art. VI, cl. 2. This principle is embodied in the doctrine of

---

[7]  "[W]e resist the pulls to decide the constitutional issues involved [here] on a broader basis than the record before us imperatively requires." *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1346 (11th Cir. 2024) (citing *Street v. New York*, 394 U.S. 576, 581 (1969)).

preemption. A preemption analysis is guided by two overarching principles. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations omitted). And second, courts must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*

Courts have recognized two categories of preemption: express and implied. Both are implicated here. As courts have cautioned, in the preemption context, "[c]ategories and labels are helpful, but only to a point, and they too often tend to obfuscate instead of illuminate." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). That is especially true here, where the *express* preemption clause of the INFORM Act uses a term—conflict—laden with meaning in the *implied* preemption context. Because the clause is express, the Court must consider whether, reading the clauses for their ordinary meaning, there is an explicit manifestation of Congress's intent to displace state law. But, because "conflict" also has a narrower, "technical" definition in the implied preemption context, the Court must consider that as well. The Court concludes that under either a plain meaning (express preemption) or narrow reading (implied preemption) of the INFORM Act, there is a conflict between it and Act 564.

### 1. Act 564 is preempted applying the ordinary meaning of the word "conflict."

"Express preemption arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*, 60 F.4th 1314, 1321 (11th Cir. 2023). As the Supreme Court has explained, "[w]hen a federal law contains an express preemption clause, we focus on the plain wording of the clause," as the plain language of the text is "the best evidence of Congress' preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011). *See also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, at 56–58 (2012) ("words are given meaning by their context, and context includes the purpose of the text."). Earlier this year, the Eleventh Circuit confirmed that "[e]xpress preemption turns primarily on 'the language of the preemption statute and the statutory framework surrounding it.'" *Carson v. Monsanto Co.*, 92 F.4th 980, 989 (11th Cir. 2024) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)). In such cases, "no presumption against preemption applies." *Carson*, 92 F.4th at 989.

Giving conflict its ordinary meaning, the Court concludes that Act 564 conflicts with the INFORM Act. The dictionary definition of conflict is to "fail to be in accord with" or to "clash or be at a variance." *Conflict*, OXFORD ENGLISH DICTIONARY (3rd ed. 2010)*; see also Conflict*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2019). The federal law provides a ceiling on the recordkeeping requirements of

8

online marketplaces by using the word "only," 15 U.S.C. § 45f(f)(3)(B) ("[A]n online marketplace shall *only be required* to count sales or transactions made through the online marketplace . . . ."), and expressly prohibits state laws that conflict with its requirements, *id.* § 45f(g) ("No State or political subdivision of a State, or territory of the United States, may establish or continue in effect any law, regulation, rule, requirement, or standard that conflicts with the requirements of this section."). Simply put, Act 564 goes beyond that ceiling by making its requirements applicable to transactions other than those that only take place through the online marketplace. The Court sees no scenario where Act 564's expansion upon the reach of the federal INFORM Act does not run afoul of its explicit limiting term: "only." Any ordinary meaning of 'conflict' is implicated when an online marketplace is both "only required" to count certain transactions *and* required to count additional transactions too. That's a conflict. Only means only.

### 2. Act 564 is preempted because it stands as an obstacle to the INFORM Act's means.

Implied preemption is deconstructed into two types: conflict preemption and field preemption.[8] Conflict preemption arises where: (1) "it is impossible for a party to comply with both state and federal law" or (2) the state law "stands as an

---

8   NetChoice does not argue that field preemption applies in this case.

obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quotation omitted). These two prongs are commonly referred to as the "impossibility" and "obstacle" prongs of conflict preemption.

The impossibility prong is straightforward in its application, and NetChoice concedes that it does not apply here. The obstacle prong, however, is nuanced. When determining whether a state law stands as an obstacle to a federal law, courts are to use their "judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1253 (11th Cir. 2022) (citation and internal quotation marks omitted). More specifically, a state law poses an unconstitutional obstacle when "the purpose of the [federal] act cannot otherwise be accomplished," "its operation within its chosen field . . . [is] frustrated," or "its provisions [are] refused their natural effect." *Crosby*, 530 U.S. at 373. So, determining whether a conflict exists is not a strictly mechanical process.

*Crosby v. National Foreign Trade Council* is instructive to the issue presented in this case. There, Massachusetts passed a law preventing state entities from patronizing companies that did business with the country of Burma. 530 U.S. at 366–67. Then, Congress passed a law imposing mandatory and conditional federal

10

sanctions on Burma. *Id*. at 368. The plaintiff sought an injunction against the Massachusetts law on the grounds that the state law was preempted by the federal one. The federal law did not contain an express preemption clause, so the Supreme Court applied implied conflict preemption principles. It held that Massachusetts's law was preempted because it ran afoul of Congress's intended objective and purpose. *Id*. at 373. In so holding, the court noted that "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id*. In other words, "if [the federal act's] . . . provisions [must] be *refused their natural effect*—the state law must yield to the regulation of Congress." *Id*.

The *Crosby* Court determined that Congress "manifestly intended" to set limits on economic pressure against Burma. *Id*. at 377. The "detailed provisions show[ed] that Congress's calibrated Burma policy [was] a deliberate effort 'to steer a middle path.'" *Id*. The state law stood "in clear contrast to the congressional scheme in . . . scope" because it prohibited certain behavior that the federal regulation expressly exempted from its regulation. *Id*. at 378. "[T]he state Act's generality [stood] at odds with the federal discreteness." *Id*. at 379.

What's more, in *Crosby*, the Supreme Court rejected the argument, as the Attorney General argues here, that there is no conflict of purpose simply because the two laws "share the same goals and because some companies may comply

11

with both sets of restrictions." *Id*. According to the court, "the fact of a common end hardly neutralizes conflicting means" because the state law still ran afoul of the federal decision about the "right degree of pressure to employ." *Id*. at 380.

So too here. Despite the laws' similar goal, their means nonetheless conflict. Congress defined high-volume third-party seller and offered one critical "clarification" or ceiling: For purposes of determining who qualifies as a high-volume third-party seller, an online marketplace is *only* required to account for transactions consummated through the marketplace or its payment processor. 15 U.S.C. § 45(f)(f)(3)(B). The INFORM Act's preemption clause provides that "[n]o State . . . may establish or continue in effect any law . . . that conflicts with the *requirements* of this section." 15 U.S.C. § 45f(g). Giving these two provisions their natural, compounding effect, no state can adopt a law that requires an online marketplace to account for any other type of transaction when determining who qualifies as a high-volume third-party seller. Act 564 does just that. It adopts a different and more expansive scope of what online marketplaces are required to do in precisely the manner the INFORM Act prohibits. In other words, Act 564 exceeds the ceiling that the INFORM Act established and, by doing so, punches a hole through the calibrated middle path that Congress intended.

This is not to say that Georgia or any other State is categorically prohibited from creating different, broader regulations than those in the INFORM Act. State

and federal laws often exist alongside one another; federal laws regularly tolerate their nonidentical state analogues, regardless of whether the state law is more expansive. The INFORM Act does not prevent states from increasing the regulatory scope of laws similar to GICA. It only prevents states from enacting laws that *conflict* with its requirements. Act 564 does just that.

* * * *

At bottom, regardless of whether the Court gives 'conflict' its ordinary meaning or imports the narrower definition from implied conflict preemption doctrine, Act 564 cannot be reconciled with the text of the INFORM Act.

### B.     The equities tip in NetChoice's favor

Having determined that NetChoice is likely to succeed on the merits, the State faces an uphill battle in opposing issuance of an injunction since likelihood of success on the merits "is generally the most important" factor. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020). This strikes the Court as especially true when the likelihood of success is premised on federal preemption grounds. The Court concludes that a least some of NetChoice's members will suffer irreparable harm if the injunction does not issue. The Court takes its cue from *America's Health Insurance Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014). There, the district court concluded that certain Georgia statutes regulating the timeliness of the payment of insurance claims submitted to "self-funded"

employer health benefit plans were preempted by federal law. The Eleventh Circuit upheld the district court's finding of irreparable harm: "To comply with the law, [the plaintiff] members will be required to incur the costs and burdens, including increased employee time, of modifying their claims processing systems, of monitoring compliance, and of preparing quarterly reports to Georgia regulators." *Id*. The plaintiffs would have been "forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties." *Id*. *See also Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022).

The same harm will result here. If forced to comply with Act 564, NetChoice's members will suffer unrecoverable expenditures of resources in trying to comply with a preempted law.[9] As represented during oral argument and supported by NetChoice's declarations, certain NetChoice members would likely need to change their website functionality to gain better visibility and track third-party communications related to potential offline transactions.[10] That is no small ask. It strikes the Court as making little sense to allow Act 564 to go into effect, require NetChoice members to incur unrecoverable compliance costs and reputational risks related to monitoring private conversations, all in the name of complying with a preempted law.

---

9   *See generally* ECFs 2-3, 2-4, 2-5.

10  *See, e.g.*, ECF 2-4, ¶¶ 37–38, 40.

Neither harm to Georgia nor public interest weigh against issuing the injunction. As a matter of law, "[b]ecause the Georgia statute[ ] [is] preempted by federal law, plaintiff is 'entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provision of state law.'" *Bank of Am., N.A. v. Sorrell*, 248 F. Supp. 2d 1196, 1200 (N.D. Ga. 2002) (citing *Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999)); *see also Am.'s Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1365 (N.D. Ga. 2012) ("As a matter of law, therefore, the Commissioner cannot suffer harm from an injunction against the [preempted] Act, and the public would be harmed by its enforcement."), *aff'd*, 742 F.3d 1319 (11th Cir. 2014). The same applies here. Because Act 564 is preempted, Georgia has no interest in its enforcement and, to the extent public interest is implicated, it can only be harmed by the enforcement of a preempted state law.

*  *  *  *

### IV. Conclusion

NetChoice's Motion for Preliminary Injunction [ECF 2] is **GRANTED**. The Attorney General of the State of Georgia is preliminarily enjoined from enforcing Act 564.

**SO ORDERED** this 30th day of June, 2024.

Steven D. Grimberg
United States District Judge